Curtis MORTEN, Donnell Woodson, James Holston, Jermaine Felder, Appellants,

v.

UNITED STATES, Appellee.

Nos. 97–CF–1263, 02–CO–54, 97–CF–1393, 97–CF–1406, 97–CF–1557.

District of Columbia Court of Appeals.

Argued Oct. 1, 2003.
Decided Aug. 12, 2004.

Andrea Roth, Public Defender Service, with whom James Klein, Jaclyn Frankfurt, and Sandra K. Levick, Public Defender Service, were on the briefs, for appellant Felder.

M. Elizabeth Kent, Washington, for appellant Woodson.

Richard S. Stolker, Rockville, MD., was on the brief for appellant Morten.

Matthew C. Leefer, Boonsboro, was on the brief for appellant Holston.

David B. Goodhand and Mary B. McCord, Assistant United States Attorneys, with whom Roscoe C. Howard, Jr., United States Attorney at the time, and John R. Fisher, Thomas J. Tourish, Jr., and Stephen J. Pfleger, Assistant United States Attorneys, were on the briefs, for appellee.

Before FARRELL, Associate Judge, STEADMAN, Associate Judge, Retired,* and NEBEKER, Senior Judge.

FARRELL, Associate J.

Appellants were found guilty by a jury of conspiracy to commit murder, first-degree premeditated murder, and multiple

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on August 8, 2004.

counts of armed assault with intent to kill, as well as related weapons offenses. We postponed resolution of their consolidated appeals until the Supreme Court decided *Crawford v. Washington,* — U.S. —, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and received supplemental briefing. The principal issue now presented is whether the admission against appellants of certain hearsay statements of nontestifying codefendants as declarations against penal interest, in conceded violation of appellants' Sixth Amendment right of confrontation, was harmless error. We hold that it was not. Under the test for constitutional harmless error established by *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we cannot say beyond a reasonable doubt that the admission of the statements did not affect appellants' substantial rights. While the significance of the statements, and their use by the prosecutors, was directed primarily to the conspiracy charge, their presence and effect was interwoven in the fabric of this trial such that there is a reasonable possibility that they affected the jury's verdicts on all counts of the indictment, necessitating reversal under *Chapman.*

We appreciate the fact that this nullifies the results of a nine-week trial. Even before certiorari was granted in *Crawford,* however, the prosecutors were on notice of the risk they assumed in seeking admission against appellants—even in redacted form—of the primary hearsay statement at issue here, codefendant Kilgore's confession to the police at the time of his arrest. *See, e.g., Lilly v. Virginia,* 527 U.S. 116, 128, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion) ("In the

years since *Bruton* [*v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] was decided, ... we have consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person."); *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). Moreover, as a result of their convictions based partly on the wrongly admitted statements, appellants each received a murder sentence of up to life imprisonment carrying a mandatory minimum term of thirty years. *See* D.C.Code § 22–2104(b) (2001). Regardless of these considerations, this court's task is to apply the standard of *Chapman* in deciding the effect of the error on appellants' rights; and the conclusion we reach is that they are entitled to a new trial cleansed of the effect of statements that should not have been admitted against them.

## I. The Facts

### A.

A jury found each of the appellants guilty of conspiracy to commit murder; of the armed first-degree murder of Michael Thompson on May 14, 1995; of multiple counts of assault with intent to kill while armed (AWIKWA) also based on May 14 shootings; and of related weapons offenses. It found all of the appellants except Holston guilty as well of several counts of AWIKWA based on shootings that took place on May 11, 1995.[1]

---

1. Specifically, the jury convicted Felder, Morten, and Woodson of the May 11 armed assault on James Dawkins with the intent to kill him, and of the armed assaults that day on Martin Tyndle, Gemese Tyndle, and Larell McCauley with the intent to kill Dawkins. It convicted all appellants of the May 14 murder of Thompson and of several armed assaults with intent to kill on that day, as well as of related weapons offenses occurring on both days.

According to the government's evidence, appellants and others, who were all members of the Stanton Terrace Crew (STC), conspired during the Spring of 1995 to kill members of a rival gang known as the Parkland Crew (PC) in order both to retaliate for the slaying of STC member Leonard Anderson and to suppress competition in the drug trade by the PC. The STC claimed the 1700 block of Stanton Terrace, S.E., as its home turf, where it took over vacant apartments in which to, among other things, stash guns and sell crack cocaine in the neighborhood. The rival PC claimed the 1800 block of Savannah Street, S.E., as its home territory, from which it likewise dealt in crack cocaine. When Leonard Anderson was shot and killed on March 20, 1995, STC members held the PC responsible and decided to retaliate. They also blamed the PC for "moving in" on the STC's drug territory and reacted violently to stifle that competition. The resulting feud or "beef" led to a series of attempted shootings of PC members in which (apparently) no one was killed or injured. That changed on May 11, 1995.

On May 11, according to government witnesses, appellants Felder, Morten, and Woodson and fellow STC members Antwanne Kilgore, Michael Thomas, and David Williams[2] came to Savannah Terrace and fired gunshots intended to kill PC member James Dawkins. As it happened, four-year-old Martin Tyndle, his mother Gemese, and her friend Larell McCauley were wounded in the shooting spree. Two days later, on the evening of May 13, STC member Michael Cureton shot and killed PC member William Zimmerman with a gun handed to him by Kilgore. Several hours later, after midnight, PC members were gathered in a parking lot on 18th Street discussing Zimmerman's death.

Michael Thompson, who was not a PC member but had been seen in the company of one earlier, was seated in a car in the parking lot. Government witnesses saw appellant Felder, accompanied by his brother, Michael Thomas, drive up to the lot and fire several shots at Thompson's car as Thompson sought to drive away. At the same time, appellants Morten and Holston came running down the hill shooting at the car as they ran. Appellant Woodson was seen nearby pointing a scoped rifle toward the parking lot. Thompson, who had been hit, died of a gunshot wound to the head.

**B.**

The government's principal insider witness was STC member Mark Barnes, who testified pursuant to a plea agreement. As the government explains (Supp. Br. for Appellee at 12), Barnes "provided a detailed accounting of the STC's membership, its goals, and its criminal activities." He described the group's twin goals of maximizing drug sales through intimidation of the rival PC and, after the shooting of Anderson, retaliating for his death. The STC members took their own revenge and did not seek police aid because, as Barnes asked rhetorically, "As far as the streets, it's like a tradition, when one of your homies gets killed, you know who did it, why not retaliate?" Barnes described different occasions on which STC members, including Felder, Morten, and Kilgore, chased and shot at PC members when they happened upon them.

Barnes, however, was not an unblemished witness. At the time he testified, he was in jail awaiting sentencing on a plea to aggravated assault while armed, a charge that carried no mandatory time and se-

---

**2.** Kilgore and Thomas both pleaded guilty to related charges before trial, and Williams' case was severed for trial because of the eleventh-hour illness of his counsel.

cured him a promise not to be prosecuted for several other felonies, including a capital murder in Maryland. The government therefore did not rely wholly on Barnes (and other live witnesses) to prove the conspiracy and its structure and goals. Rather it sought and gained the admission into evidence, as declarations against penal interest, of a videotaped statement that Kilgore had made to the police at the time of his arrest, and of transcripts of the colloquy between the court and the defendant at proceedings in which Kilgore and Thomas had pleaded guilty. Recognizing that this was "pretty powerful stuff," the trial judge required the names of all "defendants, ... unindicted coconspirators, and any other ... person[s]" to be redacted from the statements and replaced by obscuring noises on the videotape and "name deleted" in the transcripts. The jury was given a transcript of Kilgore's police statement to follow as they watched the videotape.

In this statement, Kilgore explained to the police that the STC was an organization with a chain of command, in which people "above" himself and others would supply those lower down with "pistols and cocaine" and give orders to do shootings, in particular to shoot PC members with whom the STC was "beefing." The reasons for the beef were the death of Leonard Anderson and "money." Kilgore was told by a superior that

> We ain't making enough money. Go down there and start pumping out Parkland. Get [the PC] ... off that strip [including Savannah Terrace] because they [are] taking all our money, got to get our money back.

Kilgore again described how the organization worked:

> Investigator: Okay. Now, when you all get orders, where do you get them from?

> Kilgore: [Name deleted] or [name deleted] or [name deleted].

> Investigator: Okay. And do orders come down?

> Kilgore: Yes.

> Investigator: Okay.... [H]as he given you any direct orders to do any shootings? Has he told you to do any shootings?

> Kilgore: Yes.... Mostly all our shootings. Most of them.

Kilgore had been recruited by an STC higher-up to sell crack cocaine; he would pay for the crack up front at a price depending on how much he had sold before ("the more you were selling the cheaper"). The supplier would give him guns and bullets as well, telling him and others that they "need[ed] more money" and could get more drugs and money by "tak[ing] over" the area. The STC had been "trying to take that area over" for two years.

Kilgore also told the police about the May 11 attempt to shoot James Dawkins (JC), explaining that when JC had been reported seen down at Savannah Terrace, "everybody was like, 'Okay. Let's go get him.'" They drove together to the scene where "everybody bailed out [of] the car and ran towards [JC] shooting ... everybody was shooting."

At his guilty plea proceeding, Kilgore was questioned at length by the trial judge. He admitted that there had been "a war going on between Stanton Terrace and Parkland," and that the shootings of both William Zimmerman and Michael Thompson had been in "[r]etaliation" for Leonard Anderson's death. Specifically, on the evening of May 13, believing Zimmerman was a PC member, "name deleted" had shot Zimmerman with a gun that Kilgore had given him. The next morning, Kilgore was "part of a group of people that killed ... Thompson," thinking he too was

a PC member because he had been "talking to some dudes [that were] part of the Parkland Crew." Kilgore and three other men approached Thompson as he sat in a car. Kilgore was armed, and although he did not fire his gun, his intention was to help the others if they needed it. Thompson, he explained, was shot "I guess [because] he was in the wrong place at the wrong time."

Thomas, in his plea colloquy, likewise described his membership in "an organization called [the] Stanton Terrace Crew" that was "involved in a series of violent activit[ies] against [the] ... Parkland Crew." Members of the STC, "based on [an] agreement or discussion" among themselves, "tried to get back" at the PC for the death of Anderson, to "shoot them back. Kill them." One day, for example, they had seen Derrick Patton whom they believed had shot Anderson, and "we ... jumped into different cars ... drove up there ... and started shooting at" Patton and others.

## II. Discussion

■ In light of *Crawford, supra,* the government concedes that the admission into evidence of Kilgore's videotaped confession to the police violated appellants' right to confront him as a witness. It likewise admits that under *Crawford,* "[i]t is ... reasonably clear that the plea allocutions of Kilgore and Thomas ... should not have been admitted" (Supp. Br. for

Appellee at 4). Both concessions are well-advised.[3] Applying the key distinction that *Crawford* drew between "testimonial" hearsay and "non-testimonial" hearsay, it is clear to us that all three of the statements in question were "testimonial" and could not properly be admitted without an opportunity for appellants to cross-examine the declarant. *See Crawford,* —— U.S. at ——, 124 S.Ct. at 1374 ("Whatever else the term ["testimonial"] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."); *id.* at 1371–72, (criticizing lower court decisions admitting guilty plea allocutions under *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), as examples of *Roberts'* "demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude"). Thus the issue before us boils down to whether the admission of these statements was harmless error.[4]

■ The standard of review, of course, is for error of a constitutional magnitude. Under that test, reversal is required unless the government has shown "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. As the Supreme Court has stated in a related context, "In some cases, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is

---

**3.** As it must, the government agrees further that *Crawford,* although decided after appellants' trial, applies to cases such as theirs pending on direct appeal. *See, e.g., Davis v. United States,* 848 A.2d 596, 599 (D.C.2004).

**4.** Yet a fourth hearsay statement was admitted against appellants at trial: the personal diary of unindicted coconspirator Darren McIntyre. The parties appear to agree that admission of McIntyre's diary presents no issue of "testimonial hearsay" under *Crawford,*

but dispute, almost parenthetically, whether it was admissible constitutionally under a residual application of *Roberts* and under evidentiary rules governing declarations against penal interest. We do not decide these issues. Assuming that the diary was properly admitted, we nevertheless conclude that its contents lacked sufficient evidentiary significance to affect the constitutional harmless error analysis we must apply.

so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida*, 405 U.S. 427, 429, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). But where—*Chapman* teaches—there is "a reasonable possibility that" the statements of Kilgore and Thomas "contributed to [appellants'] conviction[s]," *id.* at 432, 92 S.Ct. 1056 (citing *Chapman*), reversal is required. *See also United States v. Bagley*, 473 U.S. 667, 679 n. 9, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (noting the equivalency of the harmless "beyond a reasonable doubt" standard and the test of "[no] reasonable possibility" of an effect on the conviction).[5] We must decide that issue separately as to appellants' convictions for conspiracy and for the substantive crimes of May 11 and 14, 1995.

### A. Conspiracy

■ As to the convictions for conspiracy to commit murder, our conclusion that the admission of the hearsay statements was not harmless beyond a reasonable doubt is easily reached. The government asserts that the insider testimony of Mark Barnes, "corroborated by numerous independent pieces of evidence" (Supp. Br. for Appellee at 14), furnished compelling evidence of a twin-aimed conspiracy by STC members to reduce drug-sale competition by the rival PC and to avenge Leonard Anderson's death, and of the participation of each appellant in the conspiracy. Barnes in particular, the government asserts, gave lengthy testimony describing "the scope of the STC conspiracy, the inner workings of the ... conspiracy, and the many violent, overt actions (against PC members and others) that the STC members, including appellants, took to facilitate their conspira-

torial goals" (Supp. Reply Br. for Appellee at 8). But there are significant problems with this argument. First, as already pointed out, Barnes was not—or at least in the jury's eyes may not have been seen as—a disinterested witness, but rather one with weighty incentives to depict the conspiracy and the roster of its members in a manner shaped to the government's liking. By contrast, as appellants point out, the guilty plea statements of Kilgore and Thomas were recited to the jury merely as having been made in an "official proceeding," without mention either that they were made as part of plea agreements or of the advantages both defendants secured by pleading guilty and incriminating other STC members.

Second, the sheer number and variety of criminal acts Barnes said were carried out by STC members over six months or more, and not just against PC members, might plausibly have left the jury uncertain whether the overt acts alleged revealed a conspiracy—*i.e.*, organized, planned, and concerted activity—rather than the uncoordinated actions, as one defense counsel told the jury, of "kids who grow up in the same neighborhood" and "do what they want to do[,] ... some of them ... involved in [doing] bad things." The prosecutors thus took precaution, both in presenting their evidence and in summation, against the risk of this perception by the jury of a loose association of gang members each "doing his own thing," and the Kilgore and Thomas statements aided in that strategy. In his initial closing argument, the prosecutor "invite[d]" the jury to look at the videotape of Kilgore's confession to the police which, he said, "in and of itself establishes the existence of the con-

---

5. More recently, in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the Supreme Court set forth as a generic articulation of the *Chapman* standard

the question: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the errors?" *Id.* at 18, 87 S.Ct. 824.

spiracy," and further pointed out that "we know from the admissions of known coconspirators that their intent was to kill members of the Parkland[ ] Crew." In rebuttal, he left matters even less to chance by reading aloud verbatim those portions of Kilgore's statement to the police in which he described the STC as an organization in which "orders c[a]me down" from "people above" to shoot PC members in retaliation for the death of Anderson and get them "off the strip because [they were] making too much money." Explaining that the jury might not "have had the full picture ... nor understood the full significance" of these admissions at the time it heard them, he encouraged the jurors "again, when you go back into the room, ... to look at ... and ... to listen to the video-tape," because Kilgore "tells you what is going on in terms of the Crew and how it operates." He also quoted Thomas's admission at the plea proceeding that the STC was "an organization" involved between March and October of 1995 "in a series of violent activit[ies] against ... [the] Parkland Crew." The evidence that the defendants "were actually members of something called the Stanton Terrace Crew" and that they "sold drugs," the prosecutor concluded, "was presented to you" not because "[t]hey are ... charged with drugs in this case" but "so that you could understand why this violence took place, why they would have a motive to do what they did."

■ A prosecutor's "stress[ ] [upon] the centrality" of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial. *See Allen v. United States*, 837 A.2d 917, 923 (D.C.2003) ("[A prosecutor's] own estimate of his case, and of its reception by the jury at the time, is ... a highly relevant measure now of the likelihood of preju-

dice.") (citing and quoting *United States v. DeLoach*, 164 U.S.App. D.C. 116, 122, 504 F.2d 185, 192 (1974)). Given the prosecutor's own forceful reliance on them, the statements of Kilgore and Thomas cannot be said—as a matter of reasonable possibility—to have had no effect on the jury's conclusion that there was a conspiracy and that appellants were members of it. Nor, as the government asserts, did the redaction of the conspirators' names from the statements neutralize this prejudice. Introduced as declarations against penal interest, the statements were admitted as proof *against* the defendants even as redacted, and thus the absence from them of "direct, facially incriminatory references to appellants" (Supp. Br. for Appellee at 12 n. 10) did nothing to minimize their significance as proof of a conspiracy, and was only marginal protection against the jury equating appellants with the conspirators—the "name[s] deleted"—referred to in the statements. True, the jurors were instructed "not [to] speculate about what information was deleted or obscured" in the statements as presented to them, but the government concedes that redaction cannot have had the prophylactic effect here that it presumptively has in the different context of *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), when a statement of a non-testifying codefendant, besides being redacted, "is admitted as evidence only against the codefendant who made the statement, and not against the defendant" (Supp. Br. for Appellee at 11 n. 10). *See Plater v. United States*, 745 A.2d 953, 961–62 (D.C.2000). The jury here was not told that the hearsay statements were inadmissible against the appellants; quite to the contrary.

Because the jury may well have accepted the prosecutor's entreaty to consider the hearsay statements as proof that appellants had conspired to commit murder,

the convictions of each for that crime must be reversed.

## B. The Substantive Crimes

 The issue of whether the statements reasonably may have contributed to appellants' convictions for the individual crimes of May 11 and 14 is a harder one. As the government points out, it presented substantial eyewitness testimony identifying all or some of the appellants as among the assailants on both of those days,[6] and as having shot at Michael Thompson in particular on May 14, causing his death. In the main, these witnesses knew the appellants and were not shown to have had any obvious reason to incriminate them falsely. In light of this testimony, the government argues that "[i]t is clear beyond a reasonable doubt that a rational jury would have found the defendant[s] guilty absent the [erroneous admission of the evidence]." *Neder, supra* note 5, 527 U.S. at 18, 119 S.Ct. 1827. For the reasons that follow, we cannot agree.

*First,* although of lesser importance to our conclusion, the jury was instructed that appellants could be found guilty of the substantive crimes not only as "principals" or aiders and abettors but also as "joint principals" and "member[s] of a conspiracy who [are] liable for crimes of co-conspirators." The latter two theories subjected appellants to liability for the acts of others in furtherance of the conspiracy (or "joint criminal venture") based on their membership in the conspiracy alone.[7] *See Pinkerton v. United States,* 328 U.S. 640, 646–47,

66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Akins v. United States,* 679 A.2d 1017, 1028 (D.C. 1996) (citing *Pinkerton* ). These instructions permitted the jury to resolve doubts it had about any defendant's individual involvement in the shootings by resort to principles of vicarious liability. The government asserts that "the prosecutors did not argue a theory of *Pinkerton* liability to the jury" (Supp. Reply Br. for Appellee at 24), but that is not entirely so. In his initial closing, the prosecutor reminded the jury that "[u]nder the law of conspiracy, a conspirator is liable for the reasonably foreseeable crimes by any other coconspirator in furtherance of the conspiracy, regardless of the personal involvement of the defendant." And in rebuttal he returned to the theme, though briefly, by explaining that "even if you were to conclude, . . . the evidence could not possibly support this conclusion, but even if you were to conclude that [the defendants] weren't present on May 11 and May 14, under the law of conspiracy they can still be guilty of what happened on [those days] because of the other things they did in furtherance of the conspiracy."

*Second,* in the same way that the statements of Kilgore and Thomas were corroborative proof that a conspiracy had existed, they were significant proof of appellants' *motive* to commit the retaliatory shootings on both May 11 and May 14. As the prosecutor told the jury, the fact that appellants "were actually members of something called the Stanton Terrace Crew" and dealt drugs would help it "understand why this violence took place,

---

**6.** Prior to trial, the government dismissed the May 11 assault charges against Holston.

**7.** "Under the law of joint principals," the trial judge explained, "the acts of one participa[nt] in furtherance of a joint criminal venture can be held against another participant since each participant in a shared venture is responsible as a principal, even though he does not per-

sonally commit each of the acts constituting the offense." . The conspiracy instruction similarly explained the conditions on which, after finding a defendant guilty of the conspiracy, it could "also find him guilty of [the] remaining charges set forth in the indictment" even without proof "that the defendant participated in the actual offense."

why they would have a motive to do what they did." Mark Barnes, it is true, provided similar testimony about the dual reasons for the "beef" and the shootings, as did other more marginal witnesses; but Barnes, as mentioned, was vigorously challenged as someone with weighty reasons to fabricate or embellish. Indeed, recognizing Barnes's vulnerability, the prosecutor encouraged the jury to rely more heavily on Kilgore's statement because Barnes was "not a senior like Mr. Kilgore ... who ha[d] been around for a longer period of time [than Barnes] and [was] involved in a lot more." The other, relatively disinterested eyewitnesses whom the government now emphasizes— bystanders such as Tia and Nathan Wright, Edna Reid, and Chris Williams— identified one or more of the appellants as shooters but had comparatively little knowledge of their motive to assault Dawkins or Thompson.

*Third,* most importantly, the statements of Kilgore not only outlined the conspiracy and its goals but described the involvement of himself and "everybody" in both the May 11 and the May 14 shootings. The government argues a fine distinction by asserting that, because the names of the coconspirators were deleted from the statements (and there were numerous other STC members besides appellants), the jury reasonably would have taken the references to May 11 and 14 as proof only of overt acts demonstrating the conspiracy, not of their personal involvement in the shootings Kilgore described. As noted earlier, however, beyond a general admonishment "not [to] speculate about what information was deleted or obscured," the jury was not given any limiting instruction concerning the admission of the state-

ments, which accordingly could be used *against the appellants* for whatever corroborative significance the jury chose to give them. Appellants assert that, because they were the only four STC members in court as defendants, the jury inevitably would have "connected the dots" between Kilgore's description of unnamed gang members "bail[ing] out [of] the car" to shoot Dawkins and approaching Thompson with the same intent, and the defendants themselves seated in the dock.[8] Viewed through the lens of constitutional harmless error, the legitimacy of this claim of prejudice is apparent, and it is made even weightier by the connections the prosecutor wove between the statements and the shooting crimes in his closing argument.

So, for example, in arraying the evidence of the May 14 shootings, the prosecutor in his initial summation passed from Edna Reid, "who observes among the people shooting, ... Curtis Morten," to "the statement by Doonk [Kilgore] who says that he went down [there] with three others." At considerably greater length, the prosecutor in rebuttal told the jury "how in fact all the testimony ... make[s] sense ... when you look at it":

Let us start with May 11. Remember, you start out with Antwanne Kilgore's statement where he's talking about the fact that they are up on Stanton Terrace—some people were up on Stanton Terrace—and somebody had seen J.C. at the top of the steps, the top of the steps over here. And they see him up there and he is a target of the conspiracy.

So, they get together and they go down there in a car.... They see him up on the top of the steps. They turn around because they want to surprise

<hr>

8. Moreover, as Felder points out, Kilgore and Thomas did not enter into their plea agreements until shortly before trial began. Thus, the jury observed Kilgore and Thomas sitting at counsel table with the other defendants during voir dire.

him.... They get out of the car. They start running at him and shooting him.... You will be able to listen to his videotape and go through that at your own leisure.

When they get out and start shooting, of course, he starts running down the hill because he doesn't want to get shot. He comes down the hill and starts to run in front of the people who are sitting out here in front of their steps.

With that background in place, he moved to the testimony of Nathan Wright, who on May 11 saw "a group of people shooting[,] ... including Curtis Morten, ... Jermaine Felder, and the other two not here— Doonk, Antwanne Kilgore and Michael Thomas."

Turning similarly to the March 14 shootings, the prosecutor ridiculed the defense assertion that, for example, the eyewitness Edna Reed's testimony was uncorroborated:

There is so much corroboration here.... Doonk Kilgore to the court [at his guilty plea:] "Were you part of a group that killed a man named Michael Thompson in a car in a parking lot?" "Yes." "Did you know Michael Thompson?" "No, ma'am." "Did you have a gun?" "Yes, ma'am." "How did Michael Thompson die." "He got shot." "Who shot him?" "I guess a friend of mine."

"Was the friend of yours who shot Michael Thompson in the group with you at the time that Thompson got shot? In other words, were you standing around at the moment he got shot?" "Yes." "How many people were in the group with you?" "Three, four." "So one of the three people, you made the fourth, shot Michael Thompson?"

"Yes." "And all four of you[ ] were in the same crew or no?" "Yes." "Why was Michael Thompson shot?" "I guess he was in the wrong place at the wrong time, your honor."

The only purpose this recital served realistically was to invite equation of appellants with Kilgore's accomplices.

In sum, both in their content and in the use the prosecutors made of them in closing, the statements of Kilgore (and to a lesser degree Thomas) were a significant part of the government's presentation of the May 11 and 14 evidence. Unquestionably the government offered sufficient evidence independent of the statements to convict each appellant of the murder and the other assaults;[9] but that is not the issue. *See Arizona v. Fulminante*, 499 U.S. 279, 308–09, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Nor is the issue even whether we can say with fair assurance that the admission of the statements "had [no] substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Were the yardstick to be applied here for non-constitutional error, the evidence the government marshals in its supplemental briefs as to why the jury need not have looked to the hearsay evidence or principles of vicarious liability to convict appellants of the May 11 and 14 crimes would, at the least, give us serious pause. But the error was of constitutional magnitude, and for the reasons stated above we conclude "there is a reasonable possibility that the improperly admitted [statements of Kilgore and Thomas] contributed to the

---

9. For that reason we reject the claims of evidentiary insufficiency made by Holston and Woodson. *See, e.g., Di Giovanni v. United States*, 810 A.2d 887, 894–95 (D.C.2002); *Nixon v. United States*, 730 A.2d 145, 149 (D.C.1999).

conviction[s]." *Schneble,* 405 U.S. at 432, 92 S.Ct. 1056. That is to say, we are not satisfied that it is "clearly beyond a reasonable doubt that a rational jury would have found the defendant[s] guilty absent the errors." *Neder, supra* note 5, 527 U.S. at 18, 119 S.Ct. 1827.[10]

The judgments of conviction are, therefore,

*Reversed.*

---

**10.** This conclusion makes it unnecessary for us to address appellants' remaining assignments of error except two. Evidence of the murder of William Zimmerman by persons other than the defendants was properly admitted as an overt act in furtherance of the conspiracy, *see, e.g., United States v. Martinez–Medina,* 279 F.3d 105, 116 (1st Cir.2002), and the motions by Holston and Morten for severance from the other defendants were properly denied. *See Sams v. United States,* 721 A.2d 945, 954–55 (D.C.1998).