IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 11, 2005

**STATE OF TENNESSEE v. BILLY RAY SANLIN**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-03455, 56, 57, 58    Joseph B. Dailey, Presiding Judge**

_____

**No. W2004-00841-CCA-R3-CD  - Filed 6, 2005**

_____

The defendant, Billy Ray Sanlin, was convicted by jury of two counts of aggravated robbery and two counts of especially aggravated kidnapping. On appeal he contends that: (1) he was substantially prejudiced when the trial court improperly allowed the State to call his codefendant to testify after the codefendant previously indicated his unwillingness to testify; (2) the trial court erred in refusing to allow his defense counsel to argue the difficulties inherent in cross-racial identification in closing argument; and (3) the evidence relating to the defendant's identification as the perpetrator of the offenses was insufficient to support his convictions. Because we determine that reversible error occurred in the State's direct examination of the codefendant as a witness, we reverse the judgments of the trial court and remand for a new trial consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Wilson Jones, Chief  Shelby County Public Defender and W. Mark Ward, Assistant Shelby County Public Defender, for the appellant, Billy Ray Sanlin.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

The defendant was convicted by jury of two counts of aggravated robbery and two counts of especially aggravated kidnapping. The proof presented at trial established that on July 11, 2000, around 10:30 p.m., Kevin Houlihan was approached by a black man wearing a black nylon doo-rag,

a white t-shirt, and blue jeans. At the time, Houlihan was heading from the parking lot of his fiancee's residence to her apartment. As the man approached, the man raised a gun and told Houlihan to get on the ground or his head would be blown off. After taking Houlihan's wallet and other valuables from his person, the man asked Houlihan who was in the apartment. Houlihan told the man that his fiancee, Vicki Lloyd, and her two children were in the apartment and pleaded with the man not to enter the apartment. The man then ordered Houlihan to unlock the door of the apartment. Inside the apartment, the man encountered Vicki Lloyd on the telephone. Lloyd was told to get off the phone, and everyone was ordered to lie on the floor. The man then rummaged around the apartment, eventually robbing Lloyd of some jewelry and her purse. After the man left the apartment, Houlihan called the police.

On July 11, 2000, around 11:00 p.m., the police were involved in a chase which resulted in a collision not far from Lloyd's apartment. It was reported to the investigating officer that a white male and a black male had left the collision scene and had fled on foot. Lloyd's purse was found in the wrecked vehicle. Also, a gun which had been discarded by one of the fleeing suspects was found in a nearby field. While the black male suspect escaped, the white male suspect was caught and identified as Michael Barnes. The evidence established that the wrecked car belonged to Barnes. The gun and ammunition found at the collision scene were also attributed to Barnes. However, the purse and gun were not processed for fingerprints.

The next day, Houlihan and Lloyd were asked to identify the perpetrator from a photographic lineup prepared by police. Houlihan selected the defendant's photograph from the lineup which showed six individuals, circled the photograph, and wrote, "This is the man that put a gun to my head, took my wallet, ring, and money and said if I try to look at him, he will blow my head off." Though more tentative, Lloyd also identified the defendant from the photographic lineup and selected the picture of a man who "looked similar to the man who robbed [her] with a gun." Both Houlihan and Lloyd positively identified the defendant at trial.

On July 21, 2000, the police received information that the defendant was hiding in an apartment complex. After the police surrounded the apartment, the defendant was observed jumping from a second-story window. The defendant then ran to a car and fled. The police gave chase and eventually stopped the car. The defendant exited the car and began to run. A foot chase ensued whereupon the defendant was found hiding under a couch in a nearby house and arrested.

Police Officer Bart Ragland testified that he was responsible for the photographic lineup. Ragland stated that Houlihan and Lloyd were separated before looking at any suspect pictures. Both Houlihan and Lloyd circled the defendant's picture. Ragland also stated that he interviewed Michael Barnes but did not further elaborate. During the course of Ragland's testimony Barnes was referred to as codefendant.

Michael Barnes was called to testify for the State. However, prior to calling Barnes to the stand, the trial court and the prosecutor for the State were informed that Barnes was unwilling to testify. Barnes stated that he thought it was against his interest to testify and wanted to speak with

his lawyer. At this time, the defendant objected to the state prosecutor calling Barnes to testify. The objection was predicated on the basis that the State was calling Barnes for the sole purpose of attempting to impeach Barnes. The trial court found that Barnes no longer had a right against self-incrimination because he already pled guilty to the crimes. After denying the defendant's request to voir dire Barnes, the trial court permitted the State to examine Barnes as a witness.

Once Barnes was called to the stand, he refused to testify and told the state prosecutor that "with all due respect, I'm not going to say anything." At this time, the trial court told Barnes to answer the question. The following colloquy occurred:

> Prosecutor: Is your name Michael Barnes?
> Barnes: Ms. Weirich, I hear you, ma'am. I'm not going to say anything.
> Prosecutor: Why? Are you afraid?
> Defense Counsel: Objection, Your Honor.
> Prosecutor: Judge, I think this jury has a right to know why he's not going to cooperate.
> Court: Mr. Barnes, you, at this point, don't have the option of not testifying, and so you're required to answer the questions, and I'll overrule the objection. You may ask.
> Prosecutor: Thank you, Your Honor. Is your name Michael Barnes?
> Barnes: I understand I don't have any rights, that I'm a criminal and I'm an inmate at TDOC. I've got twenty-five years, though. That's my part in this, and I can't testify. I'm not going to. I'm sorry.
> Prosecutor: You're twenty-five years in this. What do you mean in this?
> Barnes: I'm not saying anything.
> Court: All right. Ladies and gentlemen, I'm going to ask you to return to the jury room.

Once the jury was out, the trial court told Barnes that he would be found in contempt if he refused to testify. The trial court also found that the jury was entitled to hear Barnes' convictions; therefore, the trial court stated that it would inform the jury of the fact that legally, Barnes had no right to refuse to testify. In addition, the trial court found that Barnes might have a change of heart and testify. In response, the defense counsel objected, explaining that forcing Barnes to testify was prejudicial to the defendant. The defense counsel argued that by calling Barnes with knowledge that he won't testify, "the [S]tate is allowing inferences . . . to [be] put before the jury which [are] actually not even presented." The defense counsel also asked for mistrial. After a recess period, Barnes was again called to testify. Again, he refused.

The state prosecutor then called Carry Preston and Brad Gilmartin from the criminal court clerk's office. Preston explained the booking process and introduced Barnes' records. Gilmartin testified that both the defendant and Barnes were indicted for the same offenses. Gilmartin testified that according to Barnes' guilty pleas, he had pled guilty to two counts of especially aggravated kidnaping and two counts of aggravated robbery as reflected in the indictments.

At the close of the State's proof, the defense moved for a motion for judgment of acquittal and again requested a mistrial. With regard to the defense counsel's request for a mistrial, the defense counsel gave the following argument:

> Your Honor . . . Ragland was called and testified that Mr. Barnes gave a statement; and then Mr. Barnes was called as a witness, refused to testify, refused to answer questions. Therefore, by connecting these two witnesses together, the only implication that can be derived from that is that Mr. Barnes gave a statement implicating [the defendant] in this matter, and this is . . . before the jury by implication without any proof.
>     . . . .
>     Also, I made an objection to [the prosecutor's] questioning of Mr. Barnes about . . . the fact that he was afraid. And while that may be very well true . . . why he's not testifying here today, the improper implication . . . that goes to the jury in that is that somehow [the defendant] has threatened or is threatening Mr. Barnes, and that's why he's not testifying, and I think that's an improper conclusion that can be reached from that question that Mr. Barnes subsequently failed to answer.

The trial court found no undue prejudice and denied the defendant's request for a mistrial and motion for judgment of acquittal. The defendant did not testify and was subsequently convicted of two counts of aggravated robbery and two counts of especially aggravated kidnaping.

## II. Analysis

The paramount issue raised on appeal is whether the defendant sustained prejudicial error because the State was permitted to question a codefendant in the presence of the jury after the trial court and the State were informed that the codefendant would refuse to testify. Thereafter, the State was permitted to introduce testimony indicating the codefendant was indicted with the defendant and pled guilty to the same offenses. The defendant contends that the trial court committed reversible error violating his constitutional right to confront witnesses against him. The State contends that the trial court properly allowed the State to question the codefendant because he was already convicted of the charges named on the joint indictment; and therefore, had no basis to assert his privilege against self-incrimination.

To begin, we note both federal and state courts have recognized the potential prejudice to the defendant that results from calling a witness who invokes the Fifth Amendment as well as prejudice resulting from the denial of the defendant's right to confrontation. See generally Annotation: Propriety and Prejudicial Effect of Prosecution's Calling as Witnesses, To Extract Claim of Self-Incrimination Privilege, One Involved in Offense Charged Against Accused. 19 A.L.R.4th 368.

Looking at the principles discussed in Namet v. United States, 373 U.S. 179, 187 (1963), and Douglas v. Alabama, 380 U.S. 415, 420 (1965), we note that the practice of eliciting the Fifth Amendment privilege against self-incrimination from a witness closely associated with the defendant

-4-

in relevant criminal activities requires reversal in two situations: (1) when the prosecutor consciously attempts to influence the jury by building its case out of inferences arising from use of the testimonial privilege, thus depriving a defendant of due process of law; or (2) when inferences from a witness's refusal to answer add critical weight to the prosecutor's case in a manner which denies opportunity for cross-examination, and thus unfairly prejudices the defendant by precluding him from exercising his Sixth Amendment right to confrontation. See id.

In determining whether prejudicial error was committed by the trial court, this Court has considered the following factors:

> (1) the prosecutor's intent in calling the witness; (2) the number of questions which elicit an assertion of the privilege; (3) whether either side attempted to draw adverse inferences, in closing argument or at any time during trial, from the witness' refusal to testify; (4) whether the inferences relate to central issues or collateral matters; (5) whether the inferences constitute the only evidence bearing upon the issue or are cumulative of other evidence; and (6) whether the trial court provided curative instructions.

State v. Maraschiello, 88 S.W.3d 586, 608 (Tenn. Crim. App. 2000) (citing United States v. Victor, 973 F.2d 975, 979 (1st Cir.1992); United States v. Crozier, 987 F.2d 893, 901 (2nd Cir.1993)).

In Maraschiello, this Court concluded that the trial court erred in permitting the State to call an accomplice to testify in light of his previously stated intention to invoke his privilege against self-incrimination. See id. at 608. Nevertheless, this Court determined that such an error did not mandate reversal of the defendant's convictions because (1) the prosecutor asked only a few preliminary questions, which did not associate the accomplice with the defendant prior to eliciting from the accomplice the privilege against self-incrimination; (2) the prosecutor refrained from mentioning the invocation of privilege in closing argument; and (3) the impermissible inference when viewed cumulatively did not affect the outcome of the trial due to the overwhelming evidence of the defendant's guilt, including the defendant's own statements and testimony. See id. at 608.

In the instant case, the record reflects that the prosecutor had specific knowledge that codefendant Barnes did not want to testify and desired to invoke his Fifth Amendment privilege. The record further reflects that the trial court was informed of Barnes unwillingness to testify. However, the trial court found that Barnes had no basis for a claim of privilege against self-incrimination because Barnes had already pled guilty to the charges of especially aggravated kidnaping and aggravated robbery. As the State contends, generally a witness who has already been convicted of the crimes relevant to the criminal episode need not fear incrimination because no adverse consequences can be visited upon that convicted person. See Mitchell v. United States, 526 U.S. 314, 326 (1999); Reina v. United States, 364 U.S. 507, 513, (1960). Therefore, a witness who is not a criminal defendant has no valid basis to claim self-incrimination and may be compelled to testify. See generally, Mitchell, 526 U.S. at 326. However, this general principle is premised upon the fact that there can be no further incrimination. Id. According to the record, Barnes pled guilty

to the same charges the defendant was indicted for, as well as other offenses occurring around the same time. Barnes indicated that testifying would be against his interest. While we will not speculate as to why Barnes refused to testify, we do note that the issue surrounding the validity of Barnes' claim of privilege is not as untenable as believed. In addition, we question whether the validity or invalidity of the witness's claim of privilege has any bearing on the prejudice to the defendant resulting from the witness's refusal to testify. See People v. Poma, 294 N.W.2d 221, 222 (Mich. App. 1980); Commonwealth v. Davenport, 308 A.2d 85, 87 (Pa. 1973).

Of more significance to the issue is the prejudicial effect to the defendant when the State called Barnes to testify knowing he would not cooperate. Of course, the practice of calling a witness with the advance knowledge that the witness may claim the privilege of self-incrimination does not automatically constitute prosecutorial misconduct or result in prejudice to the defendant. See Namet, 373 U.S. at 188 ("[T]he prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous."). Nonetheless, when a prosecutor consciously calls a witness who is substantially related to the criminal episode for the purpose of eliciting a claim of privilege, the defendant is likely to be prejudiced by the adverse inference drawn from such action. See id. at 187; Douglas, 380 U.S. at 420; United States v. Compton, 365 F.2d 1, 5 (6th Cir. 1966) ("It is an unfair trial tactic if it appears that counsel calls such a witness merely to get him to claim his privilege before the jury to a series of questions not pertinent to the issues on trial or not admissible under applicable rules of evidence."). These inferences are admitted without opportunity for the defendant to engage in necessary confrontation and cross-examination. See Namet, 373 U.S. at 188; see generally, Bruton v. United States, 391 U.S. 123 (1968); Pointer v. Texas, 380 U.S. 400 (1965). Therefore, the circumstances surrounding this case must be examined to determine the prosecutor's motivation, and the likelihood that the jury drew inferences prejudicial to the defendant.

From the record, it is readily apparent that the prosecutor's case was enhanced by the adverse inferences that arose when Barnes refused to testify. First, the prosecutor specifically referred to Barnes as the codefendant during direct examination of Officer Ragland. Second, the prosecutor called Barnes twice to testify, knowing he would not cooperate. Third, some of the prosecutor's questions and statements during the brief examination of Barnes were suggestive of an inference that Barnes' refusal to testify was a product of fear and that Barnes' testimony would link the defendant to the crimes. Fourth, the prosecutor had a witness read an indictment naming Barnes as co-indictee with the defendant. Fifth, the prosecutor impeached Barnes with testimony of Barnes' recent convictions, though Barnes' limited answers did not give occasion for impeachment. Finally, the prosecutor made several comments in closing argument, emphasizing the inferences brought to the jury's attention during the examination of Barnes. The below excerpt of the prosecutor's comments in closing arguments is illustrative.

> We caught the [white] male . . . Michael Barnes.
>  . . . .
> We found a gun. Michael Barnes led us to a gun nearby where he was caught in the back of a yard.
> What a coincidence. Is it a coincidence or is it guilty as charged?

Take all this evidence back and look at it. Is it a coincidence that the [victims] were robbed here – the car wrecked here that Michael Barnes, the codefendant who you saw today – you saw that fine citizen take the stand in front of you this afternoon – the car that he was driving wrecked right here. The male black that was in the car with him got away – never apprehended that night. And a gun – a gun was found right there . . . where Michael Barnes [was] arrested – the same Michael Barnes that you saw today doing twenty-five years for what he called this. 'I'm doing twenty-five years on this . . . . I don't want to talk.' Fine.

Is it a coincidence or is it guilty as charged that, ten days later, officers . . . devised a plan to get [the defendant] into custody . . . .

Given the prosecutor's reliance on Barnes' refusal to testify, we cannot but conclude that the prosecutor consciously intended to enhance its case out of the adverse inferences that arose when Barnes refused to testify.

Turning to the question of prejudice, we determine that the defendant sustained prejudice. The record indicates that the questions posed to Barnes, the reading of the joint indictment, the reading of Barnes' convictions, and the comments by the prosecutor in closing argument created the unfavorable inference that the defendant was guilty of the same criminal activity to which Barnes had already pled guilty. With these incriminating irregularities in mind, it is difficult to conclude that the prosecutor's case was not significantly strengthened or that the defendant was not unfairly prejudiced. Nor are we convinced that the trial court's curative instruction neutralized the prejudice.[1] We note that the United States Supreme Court has commented on such curative instruction stating, "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." Bruton, 391 U.S. at 129 (citations omitted).

Moreover, we note that the manner in which the codefendant was impeached via evidence of the codefendant's indictment and guilty pleas raises additional Sixth Amendment concerns. It is well-settled that the right to cross-examine falls within the Sixth Amendment's ambit of protection. See Pointer, 380 U.S. at 404. This constitutional guarantee is applied to the states via the Fourteenth Amendment. See id. at 403. In addition, Article I, Section 9 of the Tennessee Constitution guarantees the accused the right "to meet the witnesses face to face." Although the two provisions are not identical, the Tennessee Supreme Court has previously applied the standards of the United States Supreme Court under the Sixth Amendment in determining whether there has been a violation of the accused's constitutional right to confront witnesses against him under Article I, Section 9. See State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992); State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986); State v. Armes, 607 S.W.2d 234, 237 (Tenn. 1980).

---

[1] The trial court offered the following curative instruction: "[T]he proof regarding Mr. Barnes' convictions in this case before you today was allowed in for the purpose of explaining why he was told that he no longer had a right to refuse to testify. An individual loses his fifth-amendment right against self incrimination once he is convicted of that offense. No other inference may be drawn from the proof of those convictions."

Recently in Crawford v. Washington, 541 U.S. 36, 124 S.Ct.1354 (2004), the United States Supreme Court held that the Confrontation Clause prohibits the admission of testimonial hearsay against a criminal defendant without a showing that the witness who made the statement is unavailable, and that the defendant had a prior opportunity to cross-examine the witness. Crawford, 124 S.Ct. at 1374. Although the Supreme Court expressly refused to clearly and comprehensively define what constitutes testimonial or non-testimonial hearsay, the Supreme Court did explain that the term testimonial applied generally to the following categories:

> [*E*]*x parte* in-court testimony or its functional equivalent . . . such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, . . . extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Id. at 1364 (citations and internal quotations omitted). The Supreme Court also mentions plea allocutions when discussing the core testimonial statements that would trigger a Confrontation Clause problem. Id. at 1372-73.

As previously stated, after Barnes refused to testify, the prosecution was permitted to bring in a witnesses from the criminal court clerk's office, who testified that the defendant was indicted along with Barnes, and that Barnes pled guilty to two counts of aggravated robbery and two counts of especially aggravated kidnaping – the same offenses for which the defendant was being charged. Such evidence is of dubious relevance and is prejudicial. Because Barnes refused to testify, no basis was established to admit Barnes' indictment and guilty pleas. Moreover, close examination of Crawford, indicates that a codefendant's guilty pleas are testimonial in nature. See id. at 1372-73; see also, United States v. Massino, 319 F.Supp.2d 295, 298 (E.D.N.Y. 2004); People v. Carrieri, 778 N.Y.S.2d 854, 871-72 (N.Y. Sup. 2004); Morten v. United States, 856 A.2d 595, 600 (D.C. 2004). As one court recently stated:

> [A] plea is precisely the kind of formalized confession that constitutes quintessentially "testimonial" material under Crawford. Crawford explicitly included affidavits, depositions, and confessions within the core definition of "testimonial" statements. . . . Much like an affidavit, deposition, confession, or prior testimony, a guilty plea provides substantial information about the accused's criminal conduct: a guilty plea is an acknowledgment that a defendant committed certain criminal acts. . . . [A] guilty plea is, at its heart, a *confession* by an accused that he or she (1) committed specific criminal acts, (2) possessed the requisite criminal intent, and (3) caused the results embodied in the elements of the charge.

Massino, 319 F.Supp.2d at 298. As testimonial evidence, Barnes' guilty pleas were not admissible.

"Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."[2] Crawford, 124 S.Ct. at 1374. Therefore, the gravity of the trial court's error is one of constitutional dimensions insomuch that the admission of the codefendant's guilty pleas clearly violated the defendant's right to confrontation of witnesses. Accordingly, it cannot be said that inferences derived from the codefendant's refusal to testify, and the subsequent reading of the codefendant's indictment and guilty pleas did not prejudice the jury's verdict.[3] Consequently, we conclude that reversible error occurred denying the defendant a fair trial, and therefore, the defendant must be accorded a new one.

Because of the possibility of further appellate review by our supreme court, we review the defendant's remaining arguments on appeal. The defendant's second challenge relates to whether the trial court erred in refusing to allow the defense counsel to argue the difficulties inherent in cross-racial identification in closing argument.

During closing argument the trial court ruled that the defense counsel could not make reference to cross racial identification studies because there was no proof of these studies submitted by the defendant. The trial court stated that the defense counsel could argue the fact that the defendant was black and the victim's were white, but asserted that the defense counsel was to refrain from mentioning any studies discussing cross-racial identification problems.

Citing State v. Coley, 32 S.W.3d 831 (Tenn. 2000) for support, the defendant contends that his counsel should have been given latitude to address the problems of cross-racial identification in closing argument. According to the defendant, our supreme court suggested that closing argument be the proper forum to address the problems of cross-racial identification. However, we determine that the defendant's reliance on Coley is misplaced.

In Coley, our supreme court held that expert testimony regarding eyewitness identification was misleading, confusing, and failed to substantially assist the jury as the trier of fact. Id. at 837-38. Therefore, such expert testimony was *per se* inadmissible under Rule 702 of the Tennessee Rules of Evidence. Id. at 838. In reaching its holding, our supreme court cited several cases from other jurisdictions, which had also precluded expert testimony on eyewitness identification for various reasons. See id. at 836-38. Our supreme court was specifically using the rationales of other courts as a vehicle to explain its own rationale for excluding expert testimony on eyewitness identification.

---

[2] The burden of showing unavailability of a witness typically rests upon the proponent of the witness. See State v. Howard, No. W2002-01680-CCA-R3CD, 2004 WL 2715346, at *9 (Tenn. Crim. App. at Jackson, Nov. 18, 2004).

[3] Once constitutional error is established, the burden is upon the State to prove that the constitutional right violation is harmless beyond a reasonable doubt. See Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999) (citations omitted). A violation of the right to confrontation may be deemed harmless "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." State v. Sayles, 49 S.W.3d 275, 280 (Tenn. 2001) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)).

As illustration, our supreme court quoted the following language from the Kansas Supreme Court:

> We believe that the problem can be alleviated by a proper cautionary instruction to the jury which sets forth the factors to be considered in evaluating eyewitness testimony. Such instruction, coupled with vigorous cross-examination and *persuasive argument* by defense counsel dealing realistically with the shortcomings and trouble spots of the identification process, should protect the rights of the defendant and at the same time enable the courts to avoid problems involved in the admission of expert testimony on this subject.

Id. at 837 (quoting State v. Gaines, 260 Kan. 752, 926 P.2d 641, 647 (1996)) (emphasis added) (citations omitted).

Looking at this quotation within the context of its holding, it is readily apparent that our supreme court did not create or even suggest a rule where the trial court *must* permit reference to cross racial identification studies in closing argument. In fact, as previously stated, Coley's holding rejects the admission of "general and unparticularized expert testimony concerning eyewitness testimony, which is not specific to the witness whose testimony is in question . . . ." Id. at 838. Therefore, if expert testimony concerning the reliability of eyewitness identification is inadmissible *per se* under Coley's holding, certainly it is within the trial court's discretion to preclude any comments based upon generalized studies of eyewitness identification difficulties.

It has long been recognized that while both defense counsel and prosecutor have wide latitude in making their arguments to the jury, the scope of closing argument is subject to the trial court's discretion and will not be reversed absent a clear showing of abuse of discretion. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998); Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Moreover, closing arguments "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). We conclude that the trial court did not abuse its discretion when refusing to allow the defense counsel to comment on the difficulties inherent in cross-racial identification based upon generalized studies. Therefore, this issue is without merit.

The defendant's final argument on appeal is a challenge to the sufficiency of the identification evidence presented at trial. When the sufficiency of the evidence is challenged on appeal, the standard of review is whether, considering the evidence in favor of the State, any reasonable trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003). Once a jury finds the defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). As a result, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557 -58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be

drawn from that evidence. Id. The jury verdict approved by the trial judge accredits the States' witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992); State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence, nor do we substitute our inferences drawn from the circumstantial evidence for those drawn by the trier of fact. State v. Elkins, 102 S.W.3d 578, 582 (Tenn. 2003); State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002); Bland, 958 S.W.2d at 659.

It is well-established that the identification of a defendant as the perpetrator of the criminal offenses is a question of fact for the jury. See State v. Vaughn, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998); State v. Phillips, 728 S.W.2d 21, 25 (Tenn. Crim. App. 1986); White v. State, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975). Accordingly, the weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Moreover, the testimony of a victim identifying the defendant as the perpetrator is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993).

Looking at the evidence in a light most favorable to the State, we conclude that the identification evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that the defendant committed the offenses. In the present case, both victims positively identified the defendant as the perpetrator, first from a photographic lineup and later during the course of the trial. In addition, the evidence established that both victims saw the defendant in well-lighted areas. Furthermore, the defense counsel cross-examined the victims concerning the accuracy and reliability of their testimony. Here, the jury, by its verdict, chose to accredit the testimony of the victims. Accordingly, this issue is without merit.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we reverse the defendant's convictions and remand the case for a new trial.

_____
J.C. McLIN, JUDGE