Marcus PAIGE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 04–CF–715, 09–CO–1347.

District of Columbia Court of Appeals.

Argued Feb. 1, 2011.
Decided July 28, 2011.

Deborah A. Persico, appointed by the court, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Mary B. McCord, John P. Mannarino, and Margaret J. Chriss, Assistant United States Attorneys, were on the briefs, for appellee.

James Klein, with whom Alice Wang and Chris Kemmitt, filed a supplemental brief for the Public Defender Service, amicus curiae, in support of appellant solely on the issue of whether appellant's conviction for carrying a pistol without a license must be reversed as a violation of the Second Amendment.

Before OBERLY, Associate Judge, REID, Associate Judge, Retired,* and BELSON, Senior Judge.

* Judge Kramer was assigned to this case at the time of argument. Following her retirement on May 1, 2011, Judge Reid was assigned to replace her on the division. Judge Reid listened to the tape of the oral argument.

1. In violation of D.C.Code §§ 22–2101, –4502 (2001).

2. In violation of D.C.Code § 22–4504(b) (2001).

BELSON, Senior Judge:

Appellant, Marcus Paige, and his co-defendant, James Hill, were charged jointly with the first-degree murder while armed (premeditated)[1] of Otis Graham and possession of a firearm during a crime of violence ("PFCV"),[2] and were charged individually with carrying a pistol without a license ("CPWL").[3] Mr. Hill entered a guilty plea on September 10, 2002, and in March 2003 the charges against appellant proceeded to a trial by jury, which resulted in a mistrial when the jury deadlocked. Upon a second trial that began in December 2003, the jury found appellant guilty of the lesser-included offense of second-degree murder while armed, PFCV and CPWL.

Judge Ann O'Regan Keary denied appellant's post-trial motion for judgment of acquittal and motion for a new trial.[4] After appellant was sentenced, he filed a timely notice of appeal. Three months later, he filed a motion for a new trial pursuant to Super. Ct.Crim. R. 33, based on ineffective assistance of counsel and newly discovered evidence, the denial of which after a hearing appellant appeals as well. These appeals have been consolidated for our consideration.

Appellant raises several issues on appeal, including whether the trial court committed reversible error in its handling of references by the prosecution to the

3. In violation of D.C.Code § 22–4504(a) (2001).

4. Judge Keary sentenced appellant to twenty-five years of incarceration for the murder charge (with a mandatory term of five years), thirteen years of incarceration for PFCV (with a mandatory term of five years), and three years of incarceration for CPWL to run concurrently with the sentence for murder, followed by specified terms of supervised release.

non-testifying co-defendant's guilty plea, whether it improperly instructed the jury on aiding and abetting, whether there was sufficient evidence to sustain the convictions, and whether the trial court abused its discretion in denying appellant's motion for a new trial under D.C.Code § 23–110 (2001) (ineffective assistance of counsel) and D.C.Code § 22–4135 (2001) (Innocence Protection Act or "IPA") without having conducted a more extensive evidentiary hearing. We affirm.

## I. Facts

*The Eyewitness*

On September 30, 2000, Otis Graham was fatally shot while driving a truck in the 1300 block of Trinidad Avenue, Northeast. It was not until August 2001, however, that there was a break in the case. On that day, Metropolitan Police Department (MPD) Detective Michael Irving visited Neilly Griffin's home located at 1310 Trinidad Avenue, N.E., while he was investigating an unrelated homicide. At that time, Griffin asked Detective Irving what had happened regarding the killing of the man in the white truck a year earlier. Griffin pointed toward appellant, who was standing across the street, and volunteered to Detective Irving that appellant and James Hill had killed the man in the white truck. When she saw Hill later that day, she pointed him out to Detective Irving as well.

Griffin gave a different account, however, in July of 2002, when a defense investigator, James Hickey, and one of appellant's counsel came to Griffin's home in order to interview her. Griffin told them that she had not seen the shooting, and she signed a statement to that effect. Consistent with that signed statement, Griffin testified at appellant's first trial that she could not identify the shooters.

The first trial resulted in a mistrial when the jury deadlocked.

At appellant's second trial, however, Griffin testified that she was in her bedroom at approximately 6:10 a.m. on the morning of September 30, 2000, when she heard gunshots coming from what sounded like two different guns. When she looked out her window, she saw a white pickup truck coming up the street and swerving. She also saw "two guys" who came running into the middle of Trinidad Avenue behind the white pickup truck, shooting at it with their right hands and arms out straight pointing at the truck. From her window, Griffin could see the entire 1300 block of Trinidad Avenue and the intersection of Trinidad and Neal Street. Griffin also testified that she saw "sparks" and "light flashing" from the hands of the two men, although she did not see guns in their hands. The truck crashed across the street from Griffin's window and the two men ran toward it and passed by the front of Griffin's house. As the two men ran by her house she recognized one as "Dee" and the other as "Fats." She later learned that their real names were James Hill and Marcus Paige, respectively. Griffin then came outside and saw a body slumped over in the driver's seat of the truck. She saw the shooters standing in a nearby alley. When paramedics and police arrived, Griffin explained she did not speak to them because she did not want to get involved.

Griffin further testified that the statement she gave the defense investigators in July 2002 contained many false statements and that she had signed it so that her name would stay out of the case and she would not have to worry about anyone "finding out or harassing [her] or harassing [her] children." She also admitted that she did not initially comply with the subpoena to testify at the first trial and then testified falsely at that trial because

she felt intimidated and "spooked" by a man sitting in the courtroom who was "shaking and nodding his head and clearing his throat." Thereafter, at the second trial, she testified about the occurrence, named appellant and "Dee" (referring to Hill) as the shooters, and positively identified appellant in the courtroom.

*The Government's Other Evidence*

MPD officers Ernest Groves and Carlton Herndon each testified that they were familiar with appellant from their work in the neighborhood and that they saw appellant at the crime scene between 6:14 and 6:17 a.m. on the morning of the shooting. MPD Mobile Crime Laboratory Officer David Murray testified that he did not find any shell casings near the truck or any bullets in the truck, but did recover five shell casings near the intersection of Trinidad and Neal, at distances varying from nineteen to thirty-six feet from the intersection. MPD Firearms Examiner Jonathan Pope testified that he matched the five casings to a 9 mm Luger semi-automatic pistol that had been recovered at Hill's home during the execution of a search warrant on October 3, 2000. Pope testified that the location of the casings was consistent with the theory that the shooter was moving while firing the gun. Pope also explained that when a revolver is fired, the casings remain inside the gun so that if a revolver was used in the shooting, as well as a semi-automatic pistol, one would not expect to find casings from it near the scene. He testified further that use of a revolver is consistent with Griffin's testimony that she saw sparks and a flash coming from the shooter's hand, because revolvers emit a spark when fired.

*Defense Evidence*

MPD Detective Jeffrey Owens testified that when he interviewed Griffin in September 2001, subsequent to Detective Irving's interview, Griffin told Owens that she saw two men with hoods shooting at the truck. After the truck crashed, Griffin told Owens that she saw James Hill fire into the driver's-side window and that she saw appellant's face for the first time only when she went outside after the shooting. At that time, appellant was in the alley with his hood down.

Nicole Benbow, Griffin's neighbor and a friend of appellant, testified on behalf of the defense that she saw the shooting when she was coming out of her house at 6:05 a.m. that morning to go to the gas station. She identified James Hill as the only shooter and testified that she did not see appellant at the time of the shooting. However, she did testify that she heard what sounded like two guns. Benbow further testified that before she took the stand at the first trial in April of 2003, Detective Irving approached her and asked her to "do him a favor" by changing her testimony to include that she saw appellant at the time of the shooting. However, she testified, she refused to do so.

Another defense witness, Stephanie Parker, testified that she was with Hill (who later pled guilty to murdering Graham) and several others at around 5:00 a.m. on the morning of the shooting at the corner of Neal and Orren Streets near the scene of the shooting and that she saw appellant drive by in his mother's car, a grey, four-door Toyota Camry, with his mother and another man also in the car. About ten minutes later, she saw appellant drive by again, this time alone in the car. She later heard the shooting and afterward saw Hill running through the alley behind the 1300 block of Trinidad. About fifteen or twenty minutes after hearing the shooting and seeing Hill run through the alley, she saw appellant drive down Neal Street in the same car and park nearby at Neal and Orren Streets. She watched as police ar-

rived at the scene to investigate the shooting and asked appellant to move his car.

Appellant's mother, Juana Paige, also testified that on the morning of the shooting appellant drove her to a cousin's home in Fort Washington, Maryland, and that they left the house, located at 1409 Orren Street, at 5:30 a.m. They briefly stopped at the nearby home of Sharon Vest, located on the 1300 block of Orren Street, on the way to Fort Washington. There, Juana Paige saw James Hill and several others sitting in front of Vest's home. Juana Paige said it took approximately half an hour to get to Fort Washington and they arrived there around 6:00 a.m.

## II. References to Co-Defendant's Guilty Plea

*Background*

During the government's cross-examination of Nicole Benbow, government counsel embarked on a line of questioning concerning Benbow's unwillingness to testify at both trials on the basis of her assertion that she did not want to be viewed as a "snitch" in the Trinidad neighborhood. In that context, the prosecutor asked Benbow, "And you didn't want to testify at the last trial even after you learned that [James Hill] had pled guilty; isn't that correct"? Defense counsel made a general objection. The court overruled the objection and allowed Benbow to answer. Benbow answered "yes," and the prosecutor proceeded to ask: "And so you did not come to trial the first day"? Benbow then gave an explanation of why she did not do so. No cautionary instruction was requested or given.

Minutes later, after eliciting Benbow's version of the shooting, the prosecutor returned to the subject of Benbow's stated unwillingness to snitch on people in Trinidad. The prosecutor asked:

Q: And the police actually came right after that shooting and asked if you saw anything; correct?

A: Yes, they did.

Q: And you told them that you hadn't seen anything?

A: Yes, I did.

Q: Even though you weren't particularly good friends with [James Hill]?

A: Right.

Q: Now, if [Hill] had already pled guilty—

Defense counsel again made a general objection. The trial judge asked both counsel to approach the bench. Upon their approach, the trial judge told counsel that after the first objection, she "thought it was perhaps an oversight on [the prosecutor's] part to bring that out in front of the jury what the disposition was in [Hill's] case." The prosecutor responded that it was to show Benbow's bias and establish that she had no reason not to come to court and testify at the first trial because she knew Hill had already pled guilty.

The court told the prosecution to make its point without further references to the guilty plea and that she

didn't want to draw undue attention to this issue and I'm certain that the jury has been speculating about it and maybe it's in both of your interests to have the jury know what the outcome was. I can also correct it with a cautionary instruction at the end about the fact that that is not something they should consider. This has already been asked and answered once ... So, it seems to me there is no reason to go into it a second time.

During final instructions at the end of the trial, the trial judge instructed the jury that Hill's case "is not before you and has been handled as a separate matter." Defense counsel did not object to this instruc-

tion and did not follow up on the judge's above-quoted statement that she could "correct it with a cautionary instruction at the end." [5]

Appellant argues on appeal that the trial court's handling of the references to Hill's guilty plea was reversible error because the "references were inadmissible testimonial hearsay" that violated appellant's Confrontation Clause rights and that the trial court's failure to give a cautionary instruction compounded the prejudice against him, requiring reversal. The government counters that the references to Hill's guilty plea were not testimonial and were not inadmissible hearsay. The fact of the plea, the government argues, was not offered for the truth of the matter asserted, but rather to show the effect of Hill's guilty plea on Benbow's willingness to testify, citing *Guzman v. United States*, 769 A.2d 785, 793 (D.C.2001) ("Out-of-court statements are not hearsay if used for a purpose other than the truth of the matter asserted."). Therefore, in the government's view, there was no testimonial hearsay involved that would violate appellant's Confrontation Clause rights.

*Standard of Review*

■ Appellant contends that the trial court's handling of the guilty plea references is subject to review under the constitutional harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government argues, to the contrary, that the *Chapman* constitutional error test

does not apply because defense counsel did not articulate the basis of his objection when the references to the guilty plea were made and that therefore the ruling is subject to the plain-error test. The government emphasizes that even when called to the bench, defense counsel did not refer to the Confrontation Clause. Nor did he argue that the response that Hill had pled guilty was hearsay. The court made no reference to the Confrontation Clause or hearsay in discussing the matter. The government states that this suggests that the court assumed that the objection was relevance-based.

■ We agree with the government on this point and will review the court's handling of the references to Hill's guilty plea under the plain-error standard. "Objections must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he is being asked to rule." *Hunter v. United States*, 606 A.2d 139, 144 (D.C.1992). "The purpose of requiring a specific objection is to enable the prosecution to respond to any contentions raised and to make it possible for the trial judge to correct the situation without jettisoning the trial." *Id.* "If the point was not preserved, ... we review for plain error" and will reverse "only in an extreme situation in which the defendant's substantial rights were so clearly prejudiced that the very fairness and integrity of the trial was jeopardized." *Id. See also Long v. United States*, 940

---

5. At the beginning of trial, the trial judge told the jury that it would "likely hear during the course of testimony from witnesses that there was a previous trial in this case," and went on to advise it that "the law requires you to disregard that and to render your verdict based only on the evidence that will be presented during this trial." The trial court also described the contents of the indictment to the jury, explaining that it charged both appellant and Hill with murder of Otis Graham.

Just prior to discussing the indictment, the trial court also stated that "the defendant in this case" is Marcus Paige, that the "indictment ... is not evidence," and that the jury "may only consider evidence which is properly admitted in this case." During final instructions at the end of the trial, the trial judge instructed the jury that Hill's case "is not before you and has been handled as a separate matter" and "[t]he only matter before you to decide is the Paige case."

A.2d 87, 91 (D.C.2007) ("[A]ppellant ... did not object on Confrontation Clause grounds to the admission of any of the [statements]; consequently, we may consider her present contention only as a claim of plain error."); *cf. Lewis v. United States*, 938 A.2d 771, 776 (D.C.2007) (reviewing for constitutional harmless error where appellant preserved his objection to the statements on Confrontation Clause grounds). We proceed to the underlying arguments, reviewing for plain error.

*Confrontation Clause*

 We first address appellant's argument that the admission of evidence of Hill's guilty plea was error because appellant did not have an opportunity to cross-examine Hill regarding his plea, in violation of appellant's Sixth Amendment right of confrontation. In so arguing, appellant relies on *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in which the Supreme Court held that "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." The term "testimonial" applies at a minimum to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* In effect, appellant argues that the prosecutor's questions and Benbow's answer regarding Hill's guilty plea fall into the same general category, citing several pre-*Crawford* cases, *inter alia, State v. Brown*, 319 N.C. 361, 354 S.E.2d 225, 227 (1987) ("The admission

of [testimony concerning judgments rendered in other trials to which the defendant was not a party and not able to cross-examine witnesses] violated his right to confrontation under the Constitution of the United States."); *State v. Atkinson*, 25 N.C.App. 575, 214 S.E.2d 270, 272 (1975) (same); *State v. Rucki*, 367 N.J.Super. 200, 842 A.2d 290, 294 (App.Div.2004) (same).

In advancing his argument that the reference to Hill's guilty plea was testimonial hearsay as defined by *Crawford*, appellant relies heavily on our opinion in *Morten v. United States*, 856 A.2d 595 (D.C.2004), where we reversed the first-degree murder and conspiracy to commit murder convictions of appellants in part because the trial court allowed into evidence the videotaped confession and guilty plea allocutions of two of the appellants' co-defendants. *Id.* at 600. There, the government conceded that both admissions "violated appellants' right to confront [the co-defendant] as a witness." *Id.* We agreed and, "[a]pplying the key distinction that *Crawford* drew between 'testimonial' hearsay and 'non-testimonial' hearsay," stated that it was "clear to us that all three of the statements in question were 'testimonial' and could not properly be admitted without an opportunity for appellants to cross-examine the declarant." *Id.* Proceeding under the *Chapman* constitutional harmless error standard as to each of the counts of the convictions, we could not say that the effect of the admission of the various statements was harmless beyond a reasonable doubt. *Id.* at 603, 605–06.[6]

---

**6.** In *Morten*, we also examined the impact on the jury's deliberations of extended statements by the co-defendants, which explained the intricacies of the underlying criminal conspiracy. 856 A.2d at 599. Moreover, the prosecutor in his closing arguments " 'invited' the jury to look at the videotape of [a co-defendant's] confession." *Id.* at 601. With

regard to the conspiracy charge, therefore, we concluded that "the jury may well have accepted the prosecutor's entreaty to consider the hearsay statements as proof that appellants had conspired to commit murder." *Id.* at 602. Only one month later, we considered a conviction for similar substantive and conspiracy counts in *Williams v. United States*,

The present circumstances are not at all analogous to those in *Morten.* Here, the prosecutor made two mentions of only the fact that Hill plead guilty. Those references were made for the stated purpose of impeaching Benbow regarding her reasons for being unwilling to testify at the previous trial. No other reference, in opening statement, in closing argument, or otherwise, was made during the trial to the outcome of Hill's case. The jury here was given no instruction like the instruction in *Morten* regarding guilt of substantive crimes of persons who are "joint principals and members of a conspiracy." [7] Indeed, appellant was not charged with conspiracy. And, unlike in *Morten,* the government does not concede here that the statements implicated appellant's Confrontation Clause rights or were erroneously admitted. Given their limited nature and the context in which they were made, the prosecutor's two references to Hill's guilty plea in her questions and the witness's response to the first of them cannot be said to carry anything approaching the same weight or to be similar in substance to the co-defendants' statements in *Morten.*

We have had occasion elsewhere to examine more closely the definition of "testimonial" in the context of statements taken by police officers in the course of interrogations. In *Clarke v. United States,* 943 A.2d 555, 557–60 (D.C.2008), for example, we held that evidence of a son's remark to his mother that an assailant "just threw gasoline on me" was not testimonial in nature. We found it significant that the remark was not made to anyone involved with law enforcement but rather to a family member and considered this a factor that weighed against a conclusion that it was testimonial. *Id.* at 558. We also noted that both *Crawford* and the Supreme Court's later opinion in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), pointed out that a testimonial statement is by its nature "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Clarke, supra,* 943 A.2d at 558 (quotation marks omitted). We reasoned that the gas-soaked son's remark to his alarmed mother who witnessed the assault did not at all qualify as a testimonial declaration. *See id.* at 559–60.

In *Lewis, supra,* 938 A.2d at 777, we took notice of the Supreme Court's effort in *Davis, supra,* to add more clarity and guidance to the determination of what types of police interrogations produce testimony. The Court posited that statements are non-testimonial when made under circumstances that objectively indicate that the primary purpose of the interrogation is to meet an ongoing emergency. *Id.* at 778. The opposite is true when the purpose is to establish or prove events potentially relevant to later criminal prosecution. *Davis, supra,* 547 U.S. at 822, 126

---

858 A.2d 978 (D.C.2004), a case involving the same underlying gang dispute as in *Morten,* and concluded that the same videotaped confessions and plea allocations of co-defendants were "testimonial hearsay" and erroneously admitted, requiring reversal under the same standard of review. *Id.* at 981.

**7.** In *Morten,* we concluded that the admission of the extended statements by the co-defendants was not harmless beyond a reasonable doubt essentially for three reasons: "the jury was instructed that appellants could be found guilty of the substantive crimes not only as 'principals' or aiders and abettors but also as 'joint principals' and 'members of a conspiracy who are liable for crimes of co-conspirators,' " the statements could have been treated as "significant proof" of appellants' motive to the commit the crimes and, most importantly, the statements described the involvement of all participants in two separate shootings, and the prosecution made use of those statements in its closing. *Id.* at 603–04 (alterations in original).

S.Ct. 2266. This court has noted that the definition of "testimonial" is stated in functional rather than categorical terms. *Thomas v. United States*, 914 A.2d 1, 14 (D.C.2006). We took note of another approach to deal with the possibility that a jury would be exposed to "testimony" in the form of a co-defendant's confession in *Riley v. United States*, 923 A.2d 868, 886–87 (D.C.2007), where we held that Confrontation Clause rights were not implicated where co-defendants' confessions were redacted to omit any reference to appellant and the court gave proper limiting instruction and observed that in *Crawford*, the witness's testimony "was both facially incriminating and introduced against the defendant challenging the statement." *Id.* at 886–87 (quotation marks omitted).

In sum, the method the prosecutor used to question Benbow created an admixture that consisted of both a rather unfocused effort to show the bias of a witness who resisted giving testimony against residents of her Trinidad neighborhood, like appellant, and a reference to a guilty plea which, of itself, is usually a solemn declaration made for the purpose of establishing facts. In these circumstances, we must weigh, on the one hand, the truncated nature of the reference to a guilty plea, the context of bias cross-examination in which the passing reference to Hill's plea took place, the absence of any elaboration on what Hill admitted to doing, the fact that the prosecution in no way advanced the plea as evidence of appellant's guilt, and also that there was no reference to the plea in opening statement or closing argument. On the other hand, we must also consider that the jurors had been told that Hill and appellant were jointly charged with serious offenses and that there had been a previous trial. The jurors might have wondered, therefore, whether there was any relationship between Hill's admitted guilt of one or more charges and the guilt or innocence of appellant. The balance between these sets of factors and circumstances leads us to conclude that if there was error on the part of the court it was not plain, and any prejudicial effect of the reference to Hill's plea was minimal and far less than the effect such a reference might have in other circumstances. Clearly, it was inadvisable for the prosecutor to include mention of Hill's plea in a question to a witness without raising the matter first with the trial judge. We conclude, however, that the trial court's handling of the references to the guilty plea was not plainly erroneous under *Crawford*. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (elements of plain error).

We proceed to examine the other aspect of appellant's argument that the references by the prosecutor to the guilty plea and the single answer by the witness constituted inadmissible hearsay and whether their being stated in the presence of the jury and the court's failure to provide a cautionary instruction require reversal. As explained above, we examine for plain error.

*Inadmissible Hearsay*

■ Appellant argues that because Hill did not testify at appellant's trial, the references to the guilty plea were inadmissible hearsay. Appellant relies on a line of cases mostly from other jurisdictions in which courts have ruled to the effect that where persons are indicted jointly or separately for an offense or offenses arising out of the same circumstances, evidence that one defendant pled or was found guilty is inadmissible as against the other, citing *State v. Felton*, 131 N.J.Super. 344, 330 A.2d 23, 27 (App.Div.1974); *United States v. Whitney*, 229 F.3d 1296, 1304 (10th Cir.2000) ("A codefendant's guilty plea may not be used as substantive evi-

dence of a defendant's guilt.") (quotation marks omitted); *Allen v. State,* 878 A.2d 447, 450 (Del.2005) ("In this case, co-defendant [ ] did not testify at trial. Consequently, there was no justifiable basis for introducing his guilty plea into evidence."); *State v. Stefanelli,* 78 N.J. 418, 396 A.2d 1105, 1111 (1979) ("once a defendant is on trial, he is entitled to have the question of his guilt determined upon the evidence against him, not on whether a Government witness or co-defendant has [pled] guilty to the same charge") (alteration in original); *Rucki, supra,* 842 A.2d at 294 ("evidence of [co-defendant's] guilty plea was inadmissible because it was hearsay that does not fall within any exception to the hearsay rule....").

Appellant also argues for the first time on appeal that a cautionary instruction was necessary to combat the prejudice which befell the appellant as a result of the prosecutor's references, citing, *e.g., Government of Virgin Islands v. Mujahid,* 990 F.2d 111, 115–16 (3d Cir.1993) (affirming on plain-error review but stating cautionary instruction required even where co-defendant's guilty plea used for permissible purpose); *United States v. King,* 505 F.2d 602, 607 (5th Cir.1974) (same); *United States v. Harrell,* 436 F.2d 606, 614 (5th Cir.1970); *Allen, supra,* 878 A.2d at 451 (although prosecutor may introduce co-defendant's plea agreement into evidence for limited purpose, reversible error where trial court failed to give a cautionary instruction as to that limited purpose); *Pinckney v. State,* 236 Ga.App. 74, 510 S.E.2d 923, 924 (1999) (guilty plea of joint offender admissible only where joint offender is present at trial and subject to cross-examination or where admitted with instruction that it not be used as evidence of defen-

dant's guilt); *Stefanelli, supra,* 396 A.2d at 1113 (affirming on harmless error review but stating that potential for misuse of information regarding co-defendant's guilty plea is "manifest" and that court should give jury cautionary instruction, even *sua sponte* ).

According to appellant, only an instruction that explicitly told the jury that it could not consider the statement about Hill's plea in assessing the guilt of the defendant would have helped prevent prejudice against appellant. Appellant cites, *inter alia, United States v. Newman,* 490 F.2d 139, 144 (3d Cir.1974) ("At the very least, the district court should have instructed that the testimony regarding [co-defendant] was no proof whatsoever of [defendant's] guilt and that the testimony proffered should be disregarded completely in determining the guilt or innocence of [defendant]."). Instead, appellant argues, all the trial court did here was instruct the jury generally that it was to consider only appellant's case rather than Hill's.[8]

Appellant relies heavily on *Harrell, supra,* 436 F.2d 606, in which the Fifth Circuit examined the appellant's convictions for various violations of the Internal Revenue Code pertaining to non-tax-paid distilled spirits, i.e., bootlegging. A co-defendant testified at length for the defense about the transactions involved and acknowledged that he had pled guilty to all of the counts of the indictment, including conspiracy, save for one count as to which he maintained his innocence. The court reversed those convictions in part because "despite the fact that it came in without objection ... permitting the jury to hear proof as to [the co-defendant's] pre-trial plea of guilty, particularly without proper limiting instruction,[9] was, as to both the

---

**8.** *See supra* n. 5.

**9.** The jury was instructed: "The guilt or innocence of [defendant] must be determined separately from that of [co-defendant who testi-

conspiracy count and the substantive counts, error of such proportions as to require reversal." *Id.* at 614.[10]

Appellant asks us to "connect the dots" between the references to Hill's guilty plea and the theories of criminal liability presented to the jury. Here, appellant contends, the jury was presented with essentially two theories of criminal liability: either Paige himself shot at the victim, or Paige aided and abetted Hill in the shooting. The prejudice against appellant was especially strong here, appellant argues, if one considers the trial court's references to the previous trial and the indictment, both of which included the fact that appellant and Hill were charged together with killing Graham, and, as discussed below at Part III, the prejudice was further compounded by what appellant argues was an error in the aiding and abetting instruction. The combined effect of these circumstances, argues appellant, increased the likelihood of prejudice.

The government, for its part, contends that appellant cannot demonstrate any prejudice arising from the references to the guilty plea. If anything, the reference to the guilty plea provided the jury with

knowledge of another person who may have acted as the lone gunman, which was actually the defendant's own theory of the case. The failure to provide a cautionary instruction was also not plain error, according to the government. Defense counsel's own decision not to ask for one is indicative of the fact that he likely did not perceive any prejudice either. The government argues that it is not likely that the jury used the references to Hill's guilty plea as evidence of appellant's guilt. The references were made in passing in asking Benbow about her reluctance to testify at the first trial, and no references were made at that time to a second shooter or whether there was one. Benbow, in fact, testified that she saw the shooting and that there was only one shooter, Hill. The government also notes that the prosecution did not make any mention of the guilty plea in its closing argument. Finally, the government points out that appellant is unable to cite to any legal authority in this jurisdiction that would require the court to provide an instruction *sua sponte* upon a prosecutor's or witness's reference to a guilty plea.[11]

---

fied and pled guilty].... It will be necessary for you to find guilt or innocence of [defendant] separately on each of the four charges in the indictment." 436 F.2d at 614 (quotation marks omitted).

**10.** At the outset, we note several distinctions between *Harrell, supra,* and this case. As we explained above in summarizing appellant's arguments, the co-indictee in *Harrell,* Norris, took the stand for the defense and testified in detail regarding the appellant's involvement. 436 F.2d at 611. On cross-examination, Norris admitted to pleading guilty to all counts of the indictment, except for the one charging Norris with possession of an unregistered still. *Id.* Finally, the appellant himself also testified at trial, denying any knowledge of the criminal enterprise. *Id.* The combination of Norris's detailed testimony about the transactions and his plea of guilty of conspiring with

appellant Harrell in the bootlegging operation, factors not present in this case, figured heavily in the reversal of Harrell's convictions.

**11.** We have considered all of the cases cited by appellant in support of his argument that the reference to Hill's guilty plea required reversal, and find them all distinguishable because of the context in which the reference to a codefendant's guilty plea was made and/or the way the prosecution used it. *See, e.g., Newman, supra,* 490 F.2d at 143 (trial court did not give sufficiently curative instruction after co-defendant, having been instructed not to mention that another co-defendant had already been convicted of one charge, made reference to it during testimony anyway); *Atkinson, supra,* 214 S.E.2d at 271 (district attorney made a statement that other co-defendants named in indictment had en-

.We agree with the government that our court has not required a trial court to provide *sua sponte* a cautionary instruction under circumstances like those before us, and we have not held that failure to do so constitutes plain error. Courts in other jurisdictions have held that failure to give a cautionary instruction following far more explicit references to guilty pleas of co-defendants was not reversible error. *See, e.g., Stefanelli, supra,* 396 A.2d at 1113 (while it was error to admit detailed testimony of co-conspirator regarding conspiracy and an overt act regarding crime of burglary without appropriate instruction on limited admissibility of evidence of co-conspirator's guilty plea, the error was harmless, as fact of plea of guilty added little to his detailed testimony concerning his involvement in crime); *Whitney, supra,* 229 F.3d at 1304 ("[W]e have never held that a trial court's failure to so instruct constitutes per se plain error."); *Mujahid, supra,* 990 F.2d at 118 (admission of guilty plea was not plain error even where court failed to give a limiting instruction).

The Third Circuit's ruling in *Mujahid, supra,* 990 F.2d at 118, is instructive here. In that case, "the government referred to [the co-defendant's] guilty plea in its opening statement and elicited testimony from her regarding the plea during direct examination. The government never informed the district court of its reasons for introducing the guilty plea." *Id.* at 115. The defense counsel did not object to the references and the trial court gave no caution-ary instruction. *Id.* at 116. Reviewing for plain error, the Third Circuit said that "the admission of [the co-defendant's] guilty plea was not so egregious an error as to cause a miscarriage of justice." *Id.* at 118. While the court was "deeply disturbed by the government's failure to inform the court of its purpose in introducing the guilty plea, and by the district court's failure to give a limiting instruction," it held that "the admission of the guilty plea was not so prejudicial as to be plain error." *Id.*

After reviewing the entire record, we conclude that the prosecutor's references to Hill's plea of guilty and the witness's answer that she was aware of it were not so prejudicial as to require reversal. Indeed, the trial court's assessment of the prejudicial effect of the remarks, as it explained to counsel, was based upon its perception that it might be in the interest of both parties to have the jury know about the outcome of the charges against Hill, i.e., that it might serve, *inter alia,* to bolster the defense theory that there was only one shooter: Hill. It is also telling that appellant's experienced defense counsel made no further request of the trial court during that bench conference and sought no further relief, e.g., by way of a mistrial or a cautionary instruction. Considering all that occurred, if we assume that the trial court erred in its handling of the matter, it was not obvious or plain error, nor do we deem it substantially

tered guilty pleas). We also take note of the cases in which such references were held to be harmless error, or not plain error. *See Whitney, supra,* 229 F.3d at 1304 (convictions affirmed under plain-error review where defense counsel did not object or request curative instruction when co-indictees testified on behalf of government regarding their own guilty pleas); *King, supra,* 505 F.2d at 605–06 (convictions affirmed under plain-error review where defense counsel did not object or request cautionary instruction when co-indictee testified on behalf of government about his own guilty plea during direct and cross-examinations); *Stefanelli, supra,* 396 A.2d at 1108–09 (convictions reinstated under harmless-error review where defense counsel objected several times when co-indictee testified on behalf of state about his own guilty plea and trial court did not provide limiting instruction).

prejudicial in the overall circumstances of the trial. Certainly, it was not harmful to the "integrity or public reputation of [the] judicial proceedings." *Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770.

### III. Aiding and Abetting Instruction

■ Appellant next contends that the convictions should be reversed because the court provided an erroneous instruction on aiding and abetting. Appellant does not dispute that the court instructed the jury correctly on the elements of first-degree premeditated murder and the lesser-included offense of second-degree murder, as well as PFCV and CPWL. The court instructed that the government must prove beyond a reasonable doubt that, among other things, appellant "had the specific intent to kill or seriously injure the decedent or acted in conscious disregard of an extreme risk of death or serious bodily injury." Then, the court instructed the jury on aiding and abetting and stated that "it is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted the principal offender in committing the crime...." Later, when instructing the jury on the intent element of aiding and abetting, the trial court stated that the jury "may consider any statement made or acts done by the defendant and all other facts and circumstances received into evidence" in deciding whether to infer intent. It further stated, "you may infer but are not required to infer that a person intends the natural and probable consequences of acts knowingly done." The court continued, "it is entirely up to you, however, to decide what facts to find from the evidence received during this trial."

Appellant argues that the court did not specifically instruct the jury that in order to find appellant guilty as an aider or abettor, it must find that appellant had the specific *mens rea* to commit those crimes and that such an instruction is required by our holding in *Wilson–Bey v. United States,* 903 A.2d 818, 826, 836, 843 (D.C. 2006) (en banc) (constitutional error to instruct jury that it need not find that aider and abettor shared principal's intent and permit jury to find aiding and abetting liability for any acts "that are the natural and probable consequences of the crime"). Appellant concedes that this argument is subject to plain-error review due to his failure to object, but argues that the court's instruction was plain error, affected appellant's substantial rights, and seriously affected the fairness, integrity, or public reputation of the proceedings. *See Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770; *Kidd v. United States,* 940 A.2d 118, 126 (D.C.2007).

Appellant urges us to consider the instructional error in the context of other factors. He argues that the government's position in closing argument that appellant should be held accountable for the "logical consequences" of his actions, made it more crucial that the court properly instruct the jury on aiding and abetting. Appellant argues that the combined factors of a single eyewitness, the lack of physical evidence linking appellant to the crime, the references to Hill's guilty plea, and the jury's being told of the charges in the indictment could have led a reasonable juror to infer that Hill was the only person who had the requisite intent for the crime.

We agree with the government that the trial court's reference to "natural and probable consequences" was not the instruction that we prohibited in *Wilson–Bey. See Walden v. United States,* 19 A.3d 346, 349 (D.C.2011) ("We expressly refused to call into question [in *Wilson–Bey* ] the instruction that the 'jury may ... infer that "a person intends the natural and probable consequences of [his or

her] acts knowingly done or knowingly omitted (second alternation in original)." ' "). Unlike the errors we identified in the instruction given in *Wilson–Bey*, the trial court here did not instruct the jury that appellant need not have the same intent as the principal offender.[12] Moreover, both the aiding and abetting and the intent instructions were consistent with the post-*Wilson-Bey* jury instruction. Even though the trial court was instructing the jury before our holding in *Wilson–Bey*, it told the jury that to find that the defendant aided and abetted the commission of a crime, it must find that "the defendant knowingly associated himself with the person who committed the crime, that is, he participated in the crime as something that he wished to bring about, and that he intended by his actions to make it succeed." The trial court also instructed the jury that "[s]ome affirmative conduct by the defendant to help in planning or carrying out the crime is necessary," and "[m]ere physical presence by the defendant at the place and time the crime is committed is not by itself sufficient to establish his guilt."

We have upheld several times virtually the same instruction that the court gave. *See Fox v. United States*, 11 A.3d 1282, 1288–89 (D.C.2011) (upholding aiding and abetting conviction where jury instructed "to find that [appellant] 'knowingly' associated himself with the commission of a crime, participated in the crime as something that he 'wished to bring about,' and 'intended by his actions to make it suc-

ceed.' "); *Appleton v. United States*, 983 A.2d 970, 978 (D.C.2009); *cf. Coleman v. United States*, 948 A.2d 534, 552–53 (D.C. 2008) (reversing second-degree murder aiding and abetting instruction including the "natural and probable consequences" language). We conclude that under these circumstances, where the jury was properly instructed on the elements of second-degree murder and intent, the failure "to expressly inform the jury that an aider and abetter must possess the same *mens rea* as the principal" was not plain error. *Fox, supra,* 11 A.3d at 1288–89.

## IV. Remaining Issues on Appeal

*Sufficiency of the Evidence*

██ Appellant contends that the convictions should be reversed because there was insufficient evidence to support them. "When this court considers a claim of evidentiary insufficiency, it must view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. We do not distinguish between direct and circumstantial evidence, and the government is not required to negate every possible inference of innocence. Rather, it is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Coleman, supra,* 948 A.2d at 550 (quoting *Freeman*

---

12. The government concedes that "The Red Book" contains suggested bracketed material stating that "the government must prove beyond a reasonable doubt that the defendant personally acted with [insert mens rea required for the charged offense]." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 3.2 at 3–17 (5th ed. rev.2010). The editors explain that the insertion of this bracketed paragraph was "intended to effectuate *Wil-*

son–*Bey v. U.S. ...* [which] hold[s] that whether a defendant is a principal offender or an aider and abettor, she or he must have the *mens rea* required for the charged offense." *Id.* at 3–19. Indeed, the inclusion of such language would have lessened any concern that the jury was improperly instructed. However, the Red Book's bracketed language has not been required by our decisions.

*v. United States,* 912 A.2d 1213, 1218–19 (D.C.2006)).

Appellant argues that the government's theory at trial was that there were two gunmen who shot at Graham—Hill and appellant—and that theory was supported by Griffin's testimony that she heard two guns, saw two men running down the street, and saw "fire" flashing from the men's hands. However, in appellant's view, Griffin's testimony was effectively controverted by the absence of physical evidence supporting the theory, her credibility was undermined on cross-examination, that her testimony was "so lacking in probative value that the testimony . . . is utterly ineffectual in establishing the facts claimed [by the government]," quoting *Potts v. Commonwealth,* 172 S.W.3d 345, 350 (Ky.2005). Appellant points out that Griffin did not actually see any guns, and casings from only one type of gun were recovered at the scene, and that Griffin also testified that she saw the two men fire at the driver's-side window, even though there was no damage to it.

Appellant's primary contention is that Griffin's testimony was too contradictory and unsubstantiated to identify him sufficiently as a shooter. We cannot agree. Recently, in a case involving a similar evidentiary challenge, we explained that "[c]ontradictions between the testimony from various witnesses is unremarkable, and in and of itself is not enough to reverse a jury verdict." *Graham v. United States,* 12 A.3d 1159, 1163 (D.C.2011). "We have repeatedly held that the testimony of one witness is sufficient to sustain a conviction." *Id.*

■ Griffin's testimony, if credited by the jury, was sufficient to convict appellant. Griffin testified that she saw both Hill and appellant shoot in the direction of the car driven by Graham. Griffin identified appellant by his appearance and by his nickname. Stephanie Parker's testimony corroborates Griffin's account that appellant was at the scene around the time of the murder, and it contradicts appellant's mother's testimony that suggests that she was with appellant in Fort Washington at about that same time. Officers Groves and Herndon also testified that they saw appellant near the scene shortly after the murder. Benbow, the defense's witness, testified that she heard what sounded like two guns, corroborating Griffin's testimony that she saw two men shooting. Moreover, as the government points out, there is no physical evidence undermining its theory of the case; in fact, the lack of casings and the witnessing of "sparks" or "fire" are consistent with the use of a revolver. Griffin stated that she was not sure whether Hill shot through the back or the side window. The fact that the back window was missing could reasonably support the inference in the jury's mind that Hill shot through the back rather than the side.[13]

*Ineffective Assistance of Counsel*

■ Appellant also appeals the denial of his motion for a new trial based upon ineffective assistance of counsel, pursuant to D.C.Code § 23–110, and newly discovered evidence, pursuant to the IPA, D.C.Code § 22–4135. Appellant's motion for a new trial complained of his trial attorney's failures to interview and call

---

13. "Inherent incredibility is a very stringent test which has been met in only a tiny number of cases, and is only invoked where testimony can be disproved . . . as a matter of logic by the uncontradicted facts or by scientific evidence or when the person whose testimony is under scrutiny made allegations which seem highly questionable. . . ." *Graham, supra,* 12 A.3d at 1164 (quotation marks omitted). For the reasons explained above, we also cannot say that Griffin's testimony is inherently incredible.

several persons to testify at trial, including co-defendant Hill, William McCorkle, Marquett Johnson, Lola Lamb, Michael Vest, and Sharon Vest.[14] Appellant also claimed that his attorney failed to investigate Detective Michael Irving's alleged tax fraud activities, which resulted in Irving's indictment and would have damaged his credibility. Finally, appellant claimed that his attorney failed to consult with him as to whether he wanted an instruction on the lesser-included offense of second-degree murder. When appellant sought to produce several of the above witnesses to testify at the hearing on the motion for a new trial, the trial court granted in part the government's motion to exclude the testimony.[15] Among the reasons given by the trial court for excluding the witnesses were that the trial court had previously determined that some of the proposed testimony was unreliable (particularly that of Sonyette Turner),[16] that William McCorkle's testimony was not newly discovered since his existence was known to the defense before trial and defense counsel cross-examined Griffin about McCorkle, that some of the proposed testimony was inadmissible hearsay, and that other proposed testimony was irrelevant to whether defense counsel was ineffective. After hearing from appellant's trial counsel, Alan Strasser, the trial court also determined that he had not performed in a deficient manner. The court concluded that Mr. Strasser made sound strategic decisions and found no prejudice in his failure to interview Hill personally or to consult appellant regarding a lesser-included-offense instruction. In fact, the court concluded that Strasser had presented a "thorough and cohesive" case on behalf of appellant.

Appellant argues that his counsel was ineffective primarily because of his failure to carry out a reasonable investigation of potential exculpatory witnesses, "an essential prerequisite to counsel's presentation of an intelligent and knowledgeable defense." *Harris v. United States*, 441 A.2d 268, 272 (D.C.1982). Appellant maintains that the need to investigate these wit-

14. Appellant sought to call these witnesses for the following proffered reasons: co-defendant Hill would testify that appellant was not involved in the shooting; McCorkle would testify that his mother, Neilly Griffin, had lied about seeing appellant shoot Graham and that her testimony was coerced by the government; Johnson would testify that he did not witness the shooting but that he did not see appellant while he was outside before or after the time the shooting but did see Sonyette Turner outside her porch before and after the time of the shooting; Lamb would testify that Turner told her that appellant was not present at the shooting; Michael and Sharon Vest, who had testified at the first trial, would again be alibi witnesses for appellant.

15. The government moved to exclude the testimony on the basis that appellant was improperly attempting to retry the case prior to sentencing. The trial court excluded the testimony of Lola Lamb, John Hickey, Marquett Johnson, Russell Wiseman, and William McCorkle. The trial court allowed appellant to call James Hill and appellant. The government called as a witness Alan Strasser, Esq., a very experienced criminal trial lawyer, who had served as appellant's counsel at both the first and second trials.

16. The trial court denied an evidentiary hearing related to the videotaped deposition testimony of Sonyette Turner, who had provided an affidavit to the defense investigator on January 13, 2004, but was hospitalized shortly thereafter. The court ruled that Turner's deposition testimony was "largely inconsistent factually with much of what was undisputed at trial, which causes the Court to have concern about what worth her testimony ... would have in a new trial." Among the inconsistencies, the court noted that Turner stated that she heard only a single gunshot, she did not see anyone running down the street after the truck, and she did not see anyone shooting at the truck. These statements were also inconsistent with her initial affidavit. Turner passed away the day following the deposition.

nesses was critical because, in his view, the case against him was relatively weak, and, therefore, the need to adduce testimony favorable to the defense was especially strong.

■ While the decision whether to hold a hearing is discretionary, *see Lanton v. United States,* 779 A.2d 895, 901 (D.C. 2001), we have also noted that where "[t]he exculpatory value of the evidence proffered by appellant turns at bottom on the credibility of the ... witnesses specifically identified in [the] § 23–110 motion and whose proposed testimony was evidenced by signed statements[, w]e can discern no grounds for negating the credibility of those witnesses merely on the basis of their written statements." *Newman v. United States,* 705 A.2d 246, 261 (D.C. 1997) (quoting *Rice v. United States,* 580 A.2d 119, 122–23 (D.C.1990)) (alterations in original). Appellant contends that the trial court's failure to allow a full hearing was compounded by its erroneous analysis of the issue when it relied on trial counsel's testimony that his defense team interviewed more than two dozen witnesses and went door-to-door in the neighborhood. Counsel produced no evidence of these efforts other than undated interview notes, showing who those potential witnesses were and what they reported. Most important, from appellant's perspective, counsel did not produce evidence showing he went to Turner's home, Johnson's home, or Lamb's home. In addition, the trial court did not allow the defense investigator to testify. Therefore, appellant contends, the trial court's ruling was not supported by the record.

### Newly Discovered Evidence

As in the ineffective assistance of counsel argument that we are now addressing, appellant emphasizes that the trial court erred in not holding a full evidentiary hearing in order to determine whether a new trial was warranted because of newly discovered evidence. In arguing that the hearing was especially necessary here, appellant focuses on the fact that the conviction was based on the testimony of a single witness—Griffin—and the numerous inconsistencies in her accounts. Notably, appellant learned that the only witness who corroborated Griffin's initial account, police officer Michael Irving, had his veracity and fitness for duty called into question after the second trial in connection with matters that resulted in his indictment for tax fraud.[17] According to appellant, "the trial court denied appellant nearly every opportunity to present compelling, corroborating evidence from persons from whom the court had never heard live testi-

17. Appellant relatedly argues that the government violated *Brady* disclosure rules when it failed to disclose that Detective Irving lied during an MPD internal affairs investigation and had been indicted for tax fraud. According to appellant, the record shows that the government failed to disclose to the defense before the second trial material that impeached Detective Irving. Appellant states that the defense learned of Irving's tax activities only after the second trial, when the government included it in a footnote in its January 2008 Motion in Opposition to Appellant's Motion for a New Trial. Appellant argues that the government's case rested on Griffin's account, that Irving was the only one to cor-

roborate it, and, therefore, that failure to disclose Irving's misconduct prejudiced the appellant.

We review for plain error because appellant did not raise a *Brady* claim during the § 23–110 proceedings despite being aware of the information underlying these claims. *See Olano, supra,* 507 U.S. at 734–36, 113 S.Ct. 1770. We agree with the government that appellant has not met his burden to show that the government improperly withheld information regarding Detective Irving's tax issues or that any such information was material, as required by *Zanders v. United States,* 999 A.2d 149, 161 (D.C.2010). *See also Williams v. United States,* 881 A.2d 557, 567 (D.C.2005).

mony." Finally, appellant argues that the trial court "failed to understand what newly discovered evidence is" when it concluded that Turner and Johnson were not newly discovered sources of evidence because appellant had introduced affidavits from them in connection with an earlier Super. Ct.Crim. R. 33 motion [18] and because appellant's trial counsel produced undated notes of an interview with McCorkle. According to the IPA, argues appellant, so long as this evidence was not known "at the time of trial," it is new.

> We have said more than once that, where the court is faced with a claim of ineffective assistance of counsel, [D.C.Code § 23–110(c) ] creates a presumption that a hearing should be held, ... especially where the allegations of ineffectiveness relate to facts outside the trial record. At the same time, we recognize the superior vantage point of the trial judge from which to determine whether there is any appreciable possibility that a hearing could establish either constitutionally defective representation or prejudice to the defendant in the *Strickland* sense.

*Hollis v. United States,* 623 A.2d 1229, 1232–33 (D.C.1993) (quotation marks and citations omitted).

The Innocence Protection Act provides that "[a] person convicted of a criminal offense in the Superior Court of the District of Columbia may move the court to vacate the conviction or to grant a new trial on grounds of actual innocence based on new evidence." D.C.Code § 22–4135(a). "The new evidence provision of the IPA is broader and more inclusive than the judicial test for newly discovered evidence under Super. Ct.Crim. R. 33, as the IPA specifically provides for evidence that was known at the time of trial but could not be produced, and for consideration of evidence that could not be compelled or otherwise obtained. However, the diligence requirements in the IPA and Rule 33 are the same, as both require 'reasonable' or 'due' diligence." *Bouknight v. United States,* 867 A.2d 245, 255 (D.C.2005).[19] "The standard for when a hearing must be held under the IPA mirrors exactly the standard for a hearing required by D.C.Code § 23–110." *Bell v.*

18. Appellant also appeals the denial of his motion for a new trial in the interest of justice pursuant to Super. Ct.Crim. R. 33, which was filed within seven days after the verdict and carries the "more lenient" standard of review than the one applicable to a motion based on newly discovered evidence. *See Godfrey v. United States,* 454 A.2d 293, 299 (D.C.1983) ("In evaluating 'the interest of justice,' the trial court—sitting 'as a thirteenth juror,'—determines whether a 'fair trial requires that the [evidence] be made available to the jury.' ") (alteration in original) (internal quotation marks and citations omitted). Appellant attached to the Rule 33 motion the signed affidavits of Marquett Johnson and Sonyette Turner. Even under this "more lenient" standard, we affirm the trial court's denial of the Rule 33 motion for substantially the same reasons explained herein concerning the proffered testimony of Johnson and Turner. *See infra* notes 11, 13.

19. The IPA defines "new evidence" as "evidence that: (A) Was not personally known and could not, in the exercise of reasonable diligence, have been personally known to the movant at the time of the trial or the plea proceeding; (B) Was personally known to the movant at the time of the trial or the plea proceeding, but could not be produced at that time because: (I) The presence or the testimony of a witness could not be compelled or, in the exercise of reasonable diligence by the movant, otherwise obtained; or (ii) Physical evidence, in the exercise of the movant's reasonable diligence, could not be obtained; or (C) Was obtained as a result of post-conviction DNA testing." D.C.Code § 22–4131(7). "Actual innocence" is defined as a showing "that the person did not commit the crime of which he or she was convicted." Section 22–4131(1).

*United States,* 871 A.2d 1199, 1202 (D.C. 2005) (citation omitted).

The record reflects that the trial court in fact conducted a hearing at which it heard the testimony of Hill, appellant, and defense counsel Strasser. After hearing all of their testimony, the trial court credited Strasser's testimony about his conduct during the trials and reasonably concluded that Strasser made sound strategic decisions and that he did not perform in a deficient manner.

The trial court stated its basis for excluding each of the proposed witnesses. The trial court had already found that Turner's account of the shooting was inconsistent and unreliable. Any proposed testimony to reiterate her account would not correct the problems that the trial court had found. Wiseman's proposed testimony was inadmissible hearsay that would only have reiterated Hill's testimony, and McCorkle's testimony was not new because defense counsel had interviewed him prior to trial and made a strategic decision not to call him. Defense counsel was also aware of Sharon and Michael Vest's proposed testimony and concluded that risk of impeachment made them too risky to call at the second trial.

In light of the foregoing, we conclude that there was no abuse of discretion and affirm the trial court's denial of the Motion for a New Trial.

*Constitutionality of CPWL and PFCV Statutes*

Finally, appellant contends, for the first time on appeal, that D.C.Code § 22–4504(a) and (b) are unconstitutional according to the Supreme Court's ruling in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and that, therefore, his convictions must be reversed. *See Kleinbart v. United States,* 604 A.2d 861, 870 (D.C.1992) ("When intervening constitutional rulings necessitate a change in prior law, a division of this court is empowered to recognize that earlier decisions no longer have force.").[20]

Since *Heller,* we have several times rejected the argument that these firearms regulation statutes are facially invalid:

[The qualifications for firearms registration] are compatible with the core interest protected by the Second Amendment. *See Plummer v. United States,* 983 A.2d 323, 325 (D.C.2009) (as amended on denial of rehearing and rehearing en banc, May 20, 2010) ("We ... hold that the UF and CPWL statutes are not facially invalid."); *Howerton v. United States,* 964 A.2d 1282, 1289 (D.C.2009) ("[T]he Supreme Court reasoned in *Heller* [ ] [that] the Second Amendment protects 'bearing arms for a lawful purpose' by 'law-abiding, responsible citizens ... in defense of hearth and home.' " (quoting *Heller,* 128 S.Ct. at 2813, 2821)). Although the Supreme Court did not consider the particulars of the District of Columbia's registration and licensing requirements, nothing in *Heller* compels the District to register a firearm for a resident who does not satisfy these statutory requirements.

---

**20.** D.C.Code § 22–4504(a) states that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law...." In *Heller,* the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592, 128 S.Ct. 2783. The Court further concluded that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635, 128 S.Ct. 2783.

*Lowery v. United States,* 3 A.3d 1169, 1176 (D.C.2010) (second, third, and fourth alterations in original). *See also Pleasant–Bey v. United States,* 988 A.2d 496, 504 n. 6 (D.C.2010).

Accordingly, we reject this challenge to the constitutionality of D.C.Code § 22–4504(a) and (b).

For the foregoing reasons, appellant's convictions are hereby affirmed.

*So ordered.*